*373 OPINION.
Opper:
Respondent has found that petitioner’s accumulation of earnings in the taxable years was in violation of Revenue Act of 1934, section 102. The burden is upon petitioner to disprove facts leading to such a determination. United Business Corporation of America v. Commissioner (C. C. A., 2d Cir.), 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635. See Mellbank Corporation, 38 B. T. A. 1108, 1116; Wilson Brothers & Co. v. Commissioner (C. C. A., 9th Cir.), 124 Fed. (2d) 606. Cf. Dill Mfg. Co., 39 B. T. A. 1023, 1030.
In applying section 102 the triers of the issue are given the benefit of two statutory rules of prima facie evidence as aids in determining the existence of the forbidden purpose. One applies against a mere holding or investment company, but petitioner’s position as an operating company, as respondent concedes, is so clear that no question need trouble us on that score. The other operates if the taxpayer’s gains and profits are permitted to accumulate beyond the reasonable needs of the business.
Since one party to this proceeding asserts and the other denies that such was the case, it is not unnatural that much of the evidence and a great part of the argument should be directed toward aspects of this question. In order to sustain its burden of showing that the accumulations did not exceed business needs, petitioner relies upon the facts that stock sold to the public yielded a price greatly in excess of the book value of the corporation’s assets, which it accordingly attempted to build up; and that its principal product, a windshield wiper, was protected by a basic patent which would expire in 1942.
Petitioner’s case, however, is founded upon the assertion that neither of these represented an exclusive nor indeed primary purpose for retaining accumulations which grew from about $500,000 in the *374 year of petitioner’s recapitalization to something over $8,000,000 in the nine years that ended with the last tax year before us. It is in that posture of the record that we must analyze the problem inherent in the application of the provisions of section 102.
The primary issue in these cases is purpose. Cecil B. deMille, 31 B. T. A. 1161, 1174. The prima facie case which the statute creates in respondent’s favor where earnings are accumulated beyond the reasonable needs of the business is accordingly to be read as it affects that underlying issue. The prima facie case is an affirmative one created in respondent’s favor. The statute does not provide that if accumulations are within the reasonable needs of the business we must find an absence of purpose. Nor is it to be read in such a manner as to insulate ultimate from contributory evidence. So that if the reasonable needs of the business are to he relied upon as a means of convincing us of the complete innocence of petitioner’s purpose, this must at least require a demonstration that there was a purpose to provide for those business needs so satisfying and persuasive that it is unnecessary to look further for a motive for the action under criticism. And to this it must be added that a demonstrated purpose may be “not inconsistent with another purpose to reduce income taxes by having a corporation accumulate its gains and profits rather than distribute them.” Nipoch Corporation, 36 B. T. A. 662, 668. And “It is to this complete lack of the condemned purpose that its evidence must be directed and if it does not fairly prove an absence of such purpose it must fail regardless of what other purposes it may prove.” R. L. Blaffer & Co., 37 B. T. A. 851, 856; affd., 103 Fed. (2d) 487; certiorari denied, 308 U. S. 576.
That being the case, the incidental purposes which petitioner advances as justifying the accumulations are all of but secondary importance. Even if they satisfied us that the accumulations were caused in part by the plan or purpose to provide for reasonable business needs, there would remain to be examined what is expressly advanced as the principal purpose. The incidental ones would still appear as excuses, or afterthoughts, rather than evidence of an absence of the purpose described by the statute.
' But ill fact the record fails to convince us as to a business purpose in either of these instances. The evidence purporting to sustain an intention to increase petitioner’s assets so that the book value of the stock would equal the figure at which it- was sold to the public is less than persuasive. One of the bankers testified that the details of the capitalization effected when the stock was sold to the public were devised in order “to make the management work, and make these patents valuable, develop the business, build up earning power.” Becognizing that there was nothing inherent in this part of the plan *375 to prevent a speedy dissolution of the corporation even before the earning power of the business had been built up, a provision was ultimately inserted forbidding change in capital structure or voluntary dissolution until a restriction upon dividends, which will be more specifically dealt with later, had been released as to all shares. There was no reference to the creation of asset value in that provision. And, of course, if the corporation continued in operation for a sufficient time during which its earnings were satisfactory, which was inevitable under the provision forbidding dissolution, and if the earnings distributable to the public were declared as dividends, the minority stockholders could have built up their own reserve against the possibility of ultimate dissolution. In fact, there was no thought of dissolving the corporation even when, in 1942, the basic patent was due to expire; and petitioner’s president expressed the belief that the preeminent position of petitioner would continue after that time. Not only was there no enforceable contract to devote the corporation’s earnings to the creation of asset value, but if there were even a nebulous plan of that kind it was not so inflexible but that as soon as there came to be a pecuniary advantage in the distribution of larger dividends as the result of the undistributed surplus tax in 1936 and 1937, the corporation had no difficulty in departing from the program and practically doubling its dividend declarations.
The requirements of the business said to result from petitioner’s patent situation are equally unsatisfying. It is urged that upon the termination of the basic patent, petitioner’s business would be adversely affected unless it were prepared to maintain its position, either in a competitive market or by means of new products or in some other way. But we can not believe that there is no limit to the sum, no matter how great, which would be a proper accumulation, under those circumstances and for those purposes. It may be that the amount of accumulations appropriate to the situation would be a matter of opinion. But the question is the reasonable needs of petitioner’s business; and the determination of what is reasonable under a given set of circumstances is typically a judicial question. See United Business Corporation of America v. Commissioner, supra; L. Schepp Co., 25 B. T. A. 419, 429; United States v. Ragen, 314 U. S. 513. “What would be reasonable in one situation or fox-one business might be clearly uni’easonable in another.” William C. deMille Productions, Inc., 30 B. T. A. 826, 830. We can not satisfy ourselves that our function would be performed merely by accepting the decision of petitioner’s interested officers in the place of our independent judgment as to what was reasonably necessary to protect petitioner’s future position. See L. Schepp Co., supra.
*376 We know that at the beginning of 1934, the first taxable year before us, petitioner’s capital and surplus was nearly $7,000,000; that at the end of 1935 it was over $10,000,000; that the general trend of its earnings had been upward since its organization; that its business was stable and assured; and that on the basis of past experience petitioner could look forward to surplus earnings running into the millions annually. The initial cost to petitioner of all its patents was trifling; and while the basic patent would expire in 1942, petitioner had constantly improved and protected the development of its product by improvement patents. We are given no basis in the facts for a determination as to what the expense to petitioner would be of meeting competition or supplying itself with a new product, except in one respect. And that raises an inference unfavorable to petitioner’s contention, for it was testified that at tile time of the hearing there had been developed a device for raising automobile windows, and it is suggested tliat this will be available to take the place of the windshield cleaner. But the cost of preparing for the manufacture of that article was said to be from three to five million dollars, which could be deferred over a period of time. Even without considering that petitioner’s surplus prior to the instant years would have more than covered it, this amount would not constitute an undue burden on petitioner’s current excess earnings. And, of course, there would still remain the petitioner’s existing plant, either for conversion to the new use or for continued operation on the old product. We could not find from these facts -that there were no accumulations beyond the reasonable needs of petitioner’s business.[3]
It is also urged, somewhat casually, that later events have demonstrated the necessity of these accumulations. The difficulty with the suggestion is that admittedly there was no such thought in the minds of petitioner’s responsible officers during the years in issue. It is contended that whereas at the end of 1935 petitioner’s total capital and surplus, including all accumulations of undistributed earnings in whatever form, were approximately $10,500,000, by 1939 operating capital alone was in the • neighborhood of $10,800,000. Respondent by no means concedes the accuracy of these figures. He contests the propriety of including depreciation reserves in operating capital and objects to the inclusion of current assets without the deduction of current liabilities. But we have included in our findings of fact figures substantially in accord with those proposed by petitioner, since we are not satisfied that its position is wholly untenable.
*377 The objection to it, as we have said, is that if this was a result, it was not a purpose. The record abounds in references to the belief on the part of petitioner’s officials that its operating income and manufacturing business was static and would not increase. Petitioner’s president, in answer to a request on cross-examination for his opinion as to the necessity of the accumulation of earnings .in 1934 and 1935 in the operation of the business, as then being conducted, testified:
If you bring that word “business” down merely, down to the operation of a manufacturing plant, there might be some question as to what more money was needed, but we considered the business, the enterprise, an enterprise involving the interests of stockholders who had a contract to release stock * * *.
The testimony thus supports the view that the natural growth of the business bore no relation to the corporate purpose, was not a ground for the accumulations, and was not foreseen at the time by those responsible for them. The connection between accumulations and reasonable business needs, particularly if prospective rather than immediate, would have no helpful bearing on the resolution of an inquiry as to the application of section 102 unless it were intended that retained earnings limited to the requirements of the business should be so designed and thus throw light upon the purpose of the accumulation, which must always be the main object of our investigation.[4] Since it is clear from the record that the prospective needs of the business in its ordinary and anticipated expansion contributed in no degree toward the determination to accumulate earnings, we can not place upon the growth and extension of the business the importance required for the conclusion that by that showing petitioner has demonstrated the absence of a purpose to accumulate earnings for reasons dictated by the tax situation of its stockholders.
This brings us to a consideration of what was, on the theory of the taxpayer, the real purpose motivating the accumulation of its earnings. That was an outgrowth of the recapitalization in the course of which the public distribution of petitioner’s stock took place. In order, apparently, to make more attractive the stock available to the public, the bankers insisted that a dividend restriction be imposed upon most of the stock retained by the original group of controlling stockholders. The restriction took the form of an agreement with *378 , the petitioner, the terms of which were endorsed upon the certificates / representing the restricted stock, providing that no dividends would ¡ be paid thereon until $2.50 per share had been paid annually upon the unrestricted stock; that after such payment earnings distributed would be shared equally by restricted and unrestricted stock; and that the restricted shares might be released from the agreement from time to time in accordance with a formula which required an increasing amount of annual earnings per share to the point where the last share to be released would require that the corporation have annual earnings of $9 per share for all of its stock or a total of approximately $6,000,000.
Petitioner urges as its principal contention that it was a reasonable need of the business to build up an invested capital which, by increasing total earnings, would enable the controlling stockholders to release a larger amount of stock from the restriction originally placed upon it. This may have been a natural course for the majority of the stockholders to cause the corporation to adopt for their own private ends, but it had nothing to do with the needs of the business, and in fact to the extent that it benefited the controlling stockholders there was a corresponding detriment to the remainder.[5] Congress can not have intended that the term “reasonable needs of the business” should be satisfied by the financial interests of a limited stockholding group. For, of course, the interests of these stockholders as individuals were also served by the company’s policy of withholding dividends in so far as their income taxes were correspondingly reduced. But that can not be a reasonable need of the business, for it is that result which the statute is designed to attack.
Although it was repeatedly asserted that the benefit to the stockholders, from the standpoint of saving taxes, was never discussed or referred to as an element either ill the original plan of recapitalization or in the policy adopted by the company of limiting its dividends to the minimum preferred amount, the pecuniary weight of the tax-saving was so overwhehningly greater than the benefit derived ' by the majority stockholders from the release of shares that it is difficult to believe that it was only the latter and never the former to which they allowed their purposes to stray. See Helvering v. National Grocery, 304 U. S. 282.
For example, according to figures in petitioner’s brief, the total shares which were released as a result of interest and dividends paid *379 on accumulated and invested funds to the end of 1985 were[6] approximately 20,000. All the other shares released had been the result of earnings derived from operations, of which of course, the stockholders would have had the benefit without the accumulation of prior earnings from the investment of which the interest and dividends were derived. They received during the taxable years 1934 and 1935 on these 20,000 shares dividends of $2.50 a year or a total of $100,000 for the two years. In those same two years they saved in surtaxes not less than $340,000. Or, again employing petitioner’s figures, the total dividends received on all shares released through income derived from invested accumulation of prior earnings for all the years from 1927 through 1935 is only $336,205, less than half the tax saving for the two years here in issue. We are not advised what surtaxes ivere saved for the years prior to 1934 or for those subsequent to 1935. Finally, if we take all the dividends received by the controlling stockholders on shares released by income resulting from investment of accumulated earnings for the full history given by the record, 1927 through 1939, the figure is only $720,000, which is still less than the tax saving for only two years. It may be that “In the absence of the condemned purpose, the effect alone is no foundation for the tax.” But “This is not to say that the effect is of no significance, for * it may, and perhaps often does, indicate the probability of a purpose to induce it. In ordinary life it is not unreasonable to infer that the effect of a voluntary act is among the purposes of the actor. * * * And in determining the purpose, the actor’s categorical statement may be of less weight than the facts and circumstances which affect it.” R. L. Blaffer & Co., supra. “Admittedly, circumstances may evidence a purpose, and circumstances such as we find here, without a further showing, justify the finding of the prohibited purpose at which these provisions are aimed.” Cecil B. deMille, 31 B. T. A. 1161.
If the unrestricted stock had been represented by preferred shares with the provision that the common shares corresponding to the restricted stock would share in earnings only after preferred dividends, the situation would not be dissimilar to the present arrangement. But it could hardly be contended that a reasonable need of the busi-"\ ness, as opposed to the interests of the controlling stockholders, would j require the accumulation of funds for the retirement of the preferred \ shares and the consequent vesting in the common stockholders of the J right to monopolize total corporate earnings. Chicago Stock Yards, 41 B. T. A. 590; Mead Corporation, 38 B. T: A. 687; reversed other grounds (C. C. A., 3d Cir.), 116 Fed. (2d) 187.
*380 But forsaking narrow procedural matters such as presumptions and burden of proof, we can not read the record as a whole without being satisfied that a preponderance of the evidence affirmatively establishes that petitioner was “availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation through the medium of permitting gains and profits to accumulate instead of being divided or distributed.”
Some of the factors leading to this conclusion appear in the foregoing discussion. The preponderant fiscal advantage to the individual stockholders comprising the controlling group, all having large incomes protruding heavily into the surtax brackets, would be reason enough for the corporate act of curtailing distribution. There is an absence of conviction in any other explanation offered. The insiders were in undisputed control and the corporation could readily be made the instrument of their individual intention and molded to the effectuation of their private advantage as, in fact, it concededly was. The avowed primary purpose of the dividend policy pursued was admittedly one involving comparable, though less important, discriminatory benefits. The stockholders and the corporate officers are shown to have been aware of the tax situation confronting themselves. They apparently had no financial need for the dividends. It seems to us that a naive and credulous tribunal would be required for the assumption that in the confirmed practice of methodical accumulation there was no taint of a purpose to procure so desirable a monetary result for the individuals responsible for the petitioner’s decisions.
The business of the corporation was as free from hazard, as firmly established, and as favorable in prospect as could well be imagined. Production costs were constant, sales certain, collection losses negligible. If at the beginning of the tax years in issue petitioner’s officers had looked back over its history since the recapitalization in 1927, they would have seen a constantly mounting record of earnings, with the exception of the three depression years 1930 through 1932; and that even in those years the requirement for the $2.50 dividend was approximately doubled, except in the single low depression year of 1932, when it was safely met. If, at the beginning of the years in issue the corporation had had no surplus, the record fails to show a probable future need to justify accumulations of approximately one and three-fourths millions of dollars (petitioner’s entire stated capital) in one year and two and one-half millions in the next. But in fact there were accumulations of over five and over seven millions at the beginnings of the respective years. And, as bearing upon purpose, we may look to the history following this period which dis *381 closes ultimate accumulations of seventeen millions of dollars in an interval of a dozen years; or, in matter of ratio, approximately ten times the stated capital with which the corporation began operations so short a time before.
Even if the $2.50 dividend had been cumulative, as petitioner urges, there was thus an overabundant assurance that it would not default. But in fact the documents show that it was not cumulative, and we have so found. And even if the restricted stock were deprived of all share in the earnings, the record shows the normal operation of the business was sufficient to release shares which had in a few years placed the dominant stockholders where they could garner the larger proportion of corporate earnings. But in fact there was no prohibition upon an equal division of earnings between restricted and unrestricted stock after the payment of a dividend in the preferential amount; and on the record if surplus earnings had been so distributed in accordance with a recognized and confirmed corporate policy, instead of the reverse, the income on the restricted shares would have been so considerable and their future prospects so satisfactory, that we can not concede the absence of marketability and market value upon which petitioner insists. In fact in 1936 and 1987, when it became advantageous to do so, dividends on the restricted stock were paid “because of the Undistributed Profits Tax Law.” That the payments in these years were not larger may well be due, as respondent suggests, to the mathematical result that at some point increased individual surtaxes on the controlling stockholders would exceed the undistributed profits tax levied against the corporation for failing to distribute current income.
We have already seen to what extent the pecuniary benefit to the controlling stockholders from tax savings exceeded that secured from the release of stock. By a similar comparison we know that as of, say, the beginning of 1934, the earnings from operations furnished a much more probable source for the release of future stock than would any such inconsequential addition to income as could be expected in the not too remote future from earnings on invested accumulations. This result is due in part to the form of petitioner’s investments wrhich were largely in the highest grade securities with the lowest yield.
In sum, petitioner advances, as its controlling reason for these excessive accumulations, the personal advantage to its principal officers to be attained by securing earning power for the restricted stock; and complains of a lack of value in those shares until that could be done. But it was from operations that the great bulk of the earnings was to be expected; the remedy for the restriction on dividends lay in large part in the hands of these very individuals, who could cause *382 their shares to participate in earnings by the simple process of a more complete distribution; and all the facts involved in the history and background of petitioner and its moving spirits are consistent with no explanation for these distributions so much as with a desire to secure the greatest possible personal benefit to the individuals in control, an end which could not have overlooked the tax aspect. In greater detail, the situation is reflected in our findings. Alone or in combination, these preponderate in favor of respondent’s position. All explanations failing, we can not ignore the inferences from these affirmative facts. We regard them as sufficient justification for respondent’s determination and for our ultimate finding that petitioner was availed of for the inhibited purpose.
Finally, petitioner urges as a matter of law that the section is to be construed so as to require that the purpose to avoid surtax extend to all the stockholders, a situation not shown to exist here. Without stopping to suggest that petitioner in this way seeks to avail itself of a failure of proof on an issue requiring it to sustain the burden of the affirmative, we reject the contention on its merits. The words of the statute furnish no support for it, and the purpose to be served affirmatively repudiates it. If it Avere necessary for all the stockholders to escape surtax, the condemned intent and the detriment to the revenue could remain and still the stipulated penalty fail of application. A construction calling for an enforcement so capriciously dependent on fortuitous and irrelevant circumstance is certainly to be avoided. Even more detrimental to the evident statutory goal is the open and facile method of avoidance afforded, if the provision meant that a corporation could secure one impoverished stockholder not subject to the surtax rates and thus laugh in the face of any practical effort to prevent surtax avoidance through corporate accumulations. We are satisfied that the section can not carry the suggested meaning.
The second issue involves petitioner’s claim under Revenue Act of 1934, section 131,[7] to a credit against its taxes for amounts said to have been paid as income tax to the British Crown. The dispute is whether the amounts admittedly paid Avere income taxes of petitioner so as to afford it the benefits conferred by the section relied upon. Respondent contends that petitioner is not entitled to have the amount of the taxes deducted from its income tax to the United *383 States, but should have treated the British payments as though forming no part of its compensation, which of course would reach the same result as though the payments of British taxes were regarded as income to petitioner and then as deductions from gross income in computing net income and the United States tax thereon.
We can not distinguish this proceeding from Biddle v. Commissioner, 302 U. S. 573. Although that case involved dividends paid to the taxpayers from British sources, and this concerns patent royalties,[8] the taxing device established by the British legislation appears to be essentially the same. And the question under section 131 is whether petitioner paid “the tax within the meaning of our own statute. That must ultimately be determined by ascertaining from an examination of the manner in which the British tax is laid and collected what the stockholder (here the patent licensor) has done in conformity with British law and whether it is the substantial equivalent of payment of the tax as those terms are used in our own statute.” Biddle v. Commissioner, supra.
On the question of fact presented in determining the British law, we have before us only “The Income Tax Act, 1918” and statutory amendments thereto. We must accordingly consider that recourse to British case law and interpretation would be beyond the scope of this record; though that is not to say, of course, that any further light would be shed on the subject if such authorities were available to us.
Confining ourselves then to the statutory scheme, we find that income tax payments were required from petitioner’s licensees to the British taxing authorities to be computed upon the “full amount” of their “profits and gains”, and that they are specifically forbidden to deduct therefrom in computing their own income tax the amount of “any royalty or other sum paid in respect of the user of a patent.” General Rule 19. This is essentially identical with the situation applicable to a corporation which is to pay the tax on the “ ‘full amount’ of the profit ‘before any dividend thereof is made in respect of any share * * Biddle v. Commissioner, supra, footnote 3.
In the case of patent royalties the licensee is authorized to deduct the tax payment from the amount of royalties remitted to the licensor and the latter is commanded to receive the diminished amount in full satisfaction of his claim. This, however, is no different from the situation applicable to a corporation which upon “paying such dividend shall be entitled to deduct the tax appropriate thereto.”. Op. Cit.
In the case of individual stockholders such as those involved in the Biddle case there is a further requirement that the stockholder *384 include as part of his surtax income the tax paid by the corporation as so required; and in the Biddle case the taxpayers had in fact included that tax in the income shown by their returns to the British Government, had paid the surtax thereon, and had treated the payments in the same way in making their United States income tax returns. That element, together with the privilege given the British taxpayer to claim a refund of the proportionate share of the tax paid by the corporation under appropriate circumstances, were the principal contentions relied upon by the taxpayers in the Biddle case; and the Court there acknowledged that “for these limited purposes which do not affect the assessment and payment of the tax it is true that the British acts treat the stockholder as though he were the taxpayer.”
Notwithstanding these circumstances and a series of administrative interpretations favorable to the taxpayers, the Court concluded “that the taxpayer has not paid or become subject to the foreign tax here in question.”
Since petitioner is a corporation and not subject to the British surtax and since we are not advised that this petitioner might have successfully appealed from the tax paid by its licensees or whether or to what extent it would be liable for the tax upon default of the British taxpayer primarily responsible for its payment, cf. Biddle v. Commissioner, supra, we can not find in petitioner’s situation even those considerations apparently thought to be favorable to the taxpayers in the Biddle case. If any of these elements are a part of the British law, no deficiency in the presentation of evidence thereof can operate in petitioner’s favor. What we have before us is even less an indication that this tax was either assessed upon or paid by petitioner than was the case in Biddle v. Commissioner, supra.
In Crawford Music Corporation, 40 B. T. A. 284, upon which petitioner primarily relies, the payments of British tax were with respect to “royalties or sums paid periodically for or in respect of * * * a copyright * * concerning which an altogether different series of provisions “for the taxation of copyright royalties by deduction in cases where the usual place of abode of the owner of the copyright is not within the United Kingdom” appears in the British statutes. General Bules 18 and 25. The tax is not paid as a part of the income tax of the British obligor, who owes the royalty, but that person is required to “deduct thereout a sum representing the amount of the tax thereon at the rate of tax in force at the time of payment.” And “that person shall forthwith deliver to the Commissioners of Inland Revenue, * * * an account of the payment * * This is the same procedure as that required where a British obligor remits payments out of sources other than or in excess of his own t&xable income (General Bule 21), a circumstance *385 which, of course, makes it impossible to collect the tax by the expedient of levying it upon him and prohibiting the deduction from his income of the payment due his obligee. This difference in British statutory treatment prevents Crawford Music Corporation, supra, from serving as a precedent for the disposition here.
We find no evidence that Parliament has chosen to make this petitioner liable for the British tax except at most through the indirect economic results of its payment which Biddle v. Commissioner, supra, found insufficient. Since the principle for which that case stands, as we view it, is that section 131 does not treat “as taxpayers those upon whom no legal duty to pay the tax is laid”, respondent’s position on this issue is sustained; and we find it unnecessary to consider his further argument that the form of the contracts in any event placed the burden of the tax upon the English licensee and relieved petitioner of it.
Beviewed by the Board.

Decision-will be entered wider Rule SO.

 This substitute product was not in existence in the instant tax years, so that it really formed no premise for any accumulations at that time.

 * * * It requires no argument to support the premise that the cited sections do not contemplate that a business should remain static; it must be assumed that any business shall have the right to grow. Necessarily incident to the exercise of this right are the making and pursuit of plans both as to organization and as to finances which will permit the accomplishment of the contemplated development. [William C. de Mille Productions, Inc., 30 B. T. A. 826, 830.]

 Petitioner’s brief concedes that “Distributions in excess of $2.50 a share * * * would be to the disadvantage of the original stockholders because the other stockholders would receive a preponderant part of the total dividend distribution in such case.” And, “That the carrying out of those purposes and intentions [to release the restricted stock] is of benefit of 75 percent of the stockholders, including the principal stockholders.”

 Respondent computes the shave's so released- at a very much smaller figure, less than 1 percent of the total.

 SEC. 131. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.
'(a) Allowance of Credit. — If the taxpayer signifies in his return his desire to have the benefits of this section, the tax imposed by this title shall be credited with :
(1) Citizen and domestic corporation. — In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war-profits, and excess-profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; * * *

 A small portion of the payments was for interest, but the parties do not contend that these should be disposed of differently.