OPINION. Van Fossan, Judge: The first and second issues present the question of the proper compensation of Resnick and Shapiro as the petitioner’s general manager and salesman, respectively, for the year 1941. The background and history of Eesnick’s connection with the petitioner and his duties as its supervising head are well established. The record shows that Eesnick was largely responsible for the petitioner’s successful operation since its formation in 1925. He carried it through periods of financial stress with a voluntary reduction of salary and with the tacit understanding that, when the company should become financially able to do so, appropriate adjustment of his compensation would be made. During the years prior to 1941 three obstacles stood in the way of such adjustment: First, the existence of the shaky Eochester Manufacturing Co. account; second, the unliquidated “old inventory” composed of accumulated stock which could have been sold only at a loss prior to 1940; and, third, a continued obligation to Columbia (the Miller family) for the repayment of large amounts of money borrowed from them. While these conditions existed, the petitioner’s directors were reluctant to increase Eesnick’s salary. The Eochester Manufacturing Co. account was closed with only a comparatively small loss. This result was accomplished largely through Eesnick’s efforts. Then the debts to Columbia were fully paid. And, finally, the “bad inventory” which had been retained by Eesnick over the vigorous protests of the Millers was liquidated at a handsome profit. These fortunate "events removed the objections of the petitioner’s directors and consequently the appropriate adjustment of Eesnick’s salary was made by way of a bonus or additional compensation. The increase in the petitioner’s sales during 1941 from $537,000 to $1,692,000 under Eesnick’s supervision was a potent argument for additional compensation. Under all the facts and circumstances, the total amount of $40,400 paid by the petitioner to Eesnick in 1941. was reasonable, fair, and proper compensation for the services rendered by him in that year, and it is approved. In 1941 the petitioner paid Shapiro $17,850.24 for his services as salesman. Shapiro had come to the petitioner in 1939 and had been given specialized training to sell the petitioner’s products. At first he was given a small salary with the promise of a proper adjustment if he “produced.” He secured a number of new accounts and likewise “serviced” old accounts. He accomplished his duties to the complete satisfaction of the petitioner’s officers. Eesnick allotted to Shapiro $16,000 of the $18,250 authorized by the petitioner’s directors to be distributed to its salesmen as bonuses. We do not share Eesnick’s opinion of the worth of the young salesman to the company. In view of all the facts we feel that a total payment of $4,500 is reasonable and adequate compensation for Shapiro’s services by way of a bonus. The third issue presents the taxability of the petitioner for the year 1941 under the provisions of section 102 of the Internal Revenue Code. The determination of this question, as in the preceding issues, rests on the facts. See Helvering v. National Grocery Co., 304 U. S. 282, and many similar cases. In the numerous discussions and conclusions in cases of this character there is no set standard of measurement. Prominent factors in one case may become minor in another. Petitioner has the burden of establishing by a clear preponderance of the evidence that it did not permit its earnings or profits to accumulate beyond the reasonable needs of the business. There are certain familiar features, needing neither detailed definition nor supporting citations, which unmistakably mark the conduct of a taxpayer as within or without the law. The petitioner predicates its position on certain “facts” which, its counsel contends, show conclusively that it is not taxable under section 102. They may be summarized as follows: 1. Petitioner was engaged in a hazardous business which had just passed the usual “growing pains” period. 2. Certain explainable errors of estimation of 1941 income and inventory occurred. 3. Petitioner categorically denies any intent to use the corporation to shield the stockholders from taxes. 4. In this case a minority stockholder, as general manager, was in complete control of operation of the business. 5. Its conduct was marked by the adoption of sound business policies based on the outlook under most unusual and highly competitive conditions. 6. There was pressing need for additional material and improved methods of preparation and servicing of goods. 7. We have a situation where the capital retained by the petitioner was less than the amount needed to finance its business for the succeeding three-month period and there was involved the operation of a business during one of the most erratic periods in history and under rapidly changing governmental controls. 8. The operations of the business were conducted under a buying program over which petitioner had little control but was dependent upon the vagaries of mill development, with the consequent necessity of keeping a strong financial position. To this summary we may add that the petitioner had a consistent prior dividend record; that its officers and stockholders borrowed or withdrew no money from it, and that it invested no funds in securities or investments unrelated to its business. It is also to be borne in mind that the year 1941 was, as one witness expressed it, a “flash year,” in which petitioner tripled its business over 1940, and that. while the total for 1942 showed a leveling off toward normal, the sales in the first quarter of 1942 were greater even than those in 1941. There is no contention that petitioner was formed for the purpose of preventing the imposition of surtax on its shareholders or the shareholders of any other corporation. The respondent’s counsel cites many cases which are more or less helpful in appraising the situation but which need not be noted, briefed, or distinguished here. He then attempts to analyze and compare the figures relating to the several years prior to 1941 with the year 1941, and concludes therefrom that the petitioner had ample funds with which to pay additional dividends. Petitioner’s profit after taxes for 1941 was $134,756.59. The question is: Did petitioner act prudently under the law in distributing only $8,000 in dividends, or, to state the question otherwise, was petitioner justified in concluding that it was good business practice to retain a sufficient margin of funds to cover the uncertainties inherent in the situation, to provide possible additional facilities, and to maintain a strong liquid position ? The petitioner contends that it had urgent need for additional equipment, such as a pickling plant, slitter, shears, and roller leveler. The record discloses that the pickling plant, slitter, and roller leveler would cost about $72,000. No cost was alloted to the shears, but the petitioner’s counsel claims that the entire cost of the additional equipment would range from $75,000 to $100,000. The respondent argues that, even if the petitioner were correct in its estimate, it took no positive action toward meeting the alleged needs for such equipment. The respondent’s position is but partially supported by the record. The petitioner has shown conclusively that it was seriously handicapped in its business by the lack of the required equipment. It took steps to secure the necessary priorities, but was told by the War Production Board that it would be given no priorities to obtain the facilities from the manufacturers. Any formal application to the War Production Board, therefore, would have been a useless gesture. It then set aside $25,000 in a special fund for the purchase of the pickling plant. About one-half of the petitioner’s customers were engaged in war production. We believe the petitioner had a right to hope, if not to expect, that the War Production Board restrictions would be lifted as the proportion of its war industry customers might rise. We believe that in the situation in which petitioner found itself, considering the whole picture, the ratio of working capital to sales, the prospective increase in sales, the reasonable desire and plans for increased facilities, the absence of any history of prior accumulations, the fact that the law does not envision the stifling of normal growth, together with other facts of record, petitioner acted prudently and has proven by a clear preponderance of the evidence that it did not permit its earnings or profits to accumulate beyond the reasonable needs of the business. It follows that it has justified the nonpayment of dividends beyond the $8,000 declared and that petitioner is not subject to the provisions of section 102. The petitioner was no “incorporated pocketbook” of a single individual or a group of wealthy stockholders who used it for holding or investment purposes. The complete absence in its balance sheet of any loans to officers or stockholders and of any investment or securities unrelated to its business tends to confirm its lack of either an intent to circumvent the law or of action imputing a “purpose of preventing imposition of the surtax upon its stockholders * * * through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed.” Its accumulations in 1941 were impelled by sound and cogent business reasons and were not beyond the reasonable needs of its business (section 102 (c)). As we have found as a fact, it was not availed of for the proscribed purpose. Decision will be entered v/nder Rule 60.