**WORLD PUB. CO. v. UNITED STATES.**
Civil Action No. 1830.

District Court, N. D. Oklahoma.

May 16, 1947.

Breckinridge & Boone, of Tulsa, Okl. for plaintiff.

Whit Y. Mauzy, U. S. Atty., of Tulsa, Okl. for defendant.

BROADDUS, District Judge.

### Jurisdiction.

1. This action is to secure a refund of income taxes paid to H. C. Jones, Collector of Internal Revenue for the United States within Oklahoma. As Jones was not the collector at the time the suit was filed, it was properly filed against the United States in the Northern District of Oklahoma. 28 U.S.C.A. § 41(20).

2. The first cause of action embraces a claim for a refund of income taxes paid by the plaintiff for the calendar year 1942, and the second for a refund of taxes paid for the calendar year 1943. In both years a deficiency tax was assessed and paid, and the taxpayer filed claim for refund on the respective sums paid, October 23, 1945. The Commissioner having failed to render a decision upon said claims for a period of over six months, this action was filed on June 6, 1946. As it was begun after the expiration of the period of six months, and within two years after the expiration of such period, the action may be maintained. 26 U.S.C.A. Int.Rev. Code, § 3772(a) (1) (2).

### The World Publishing Company.

3. Stipulations filed by the parties as to a portion of the facts are hereby adopted. For a consideration of the questions presented, a portion of the stipulated facts will be rearranged and referred to in these findings with other facts determined herein.

4. The original name of the plaintiff was the World Publishing Company of Indian Territory. This name was changed to the World Publishing Company by charter amendment in 1913. For convenience, the "World Publishing Company" will be referred to from time to time as the

"World" or the "Publishing Company." It was organized in 1906 with an authorized capital stock fully issued and paid of $25,000, consisting of 1000 shares of the par value of $25 per share. The capital stock was increased April 1, 1913 (about the time of Mr. Lorton's purchase of one-half of the stock in the Publishing Company), to 5000 shares of like par value, the increase of 4000 shares being a stock dividend. The capital stock was again increased on November 27, 1918 (after Mr. Lorton had acquired all the stock in the year 1917), to 12,000 shares of the same par value, the increase being 1800 shares as a stock dividend, 5199⅗ shares for goodwill, press franchise, and subscription lists, and ⅖ of a share for cash.

5. The next increase was on September 12, 1922, wherein the stock was increased to 10,000 shares, at a par value of $100 per share. Of these shares, 3000 shares were issued for the 12,000 shares of outstanding stock, a stock dividend of 2750 shares was issued, and the remaining 4250 shares were issued for goodwill, press franchise, and subscription lists. The total authorized and issued capital stock was $1,000,000. Summarized, the consideration for the common capital stock was $25,010 in cash for 250.1 shares, $420,000 for stock dividends, and $544,990 for goodwill, press franchise, and subscription lists. The corporation was not formed for the purpose of preventing increased surtax on its shareholders.

6. The World at all times material to this action was owned and controlled by Mr. Eugene Lorton. At the time this suit was instituted, he was the owner of 9997 shares of the stock, his wife, Mrs. Maud Lorton, held one share, F. O. Larson one share, and N. G. Henthorne one share. Mr. Lorton acquired 50% of the outstanding capital stock of the Company in 1913, and in 1917 acquired the remaining outstanding stock.

7. The shareholders for the years 1942 and 1943 were the same as set out above. Maud Lorton was the wife of Eugene Lorton in 1913 when he acquired 50% of the stock, and that relationship has continued until the present time. Mr. F. O. Larson has been the business manager of the taxpayer for many years, and Mr. N. G. Henthorne has also been with the World and Mr. Lorton for many years in different capacities. The salaries paid the officers and directors for their duties in their respective positions in 1942 and 1943 are as follows: Mr. Eugene Lorton, $50,000, Mrs. Maud Lorton, $7,200, Mr. F. O. Larson, $16,100 and Mr. N. G. Henthorne, $16,100. The record discloses no loans or advances by the corporation to the shareholders.

8. By duly enacted laws of Congress surtax rates on the income of individuals were increased substantially for years under consideration here, as shown by the following table in which rates on surtax net incomes of $50,000 and $100,000 are taken as examples:

| Year to Which Tax Applies | Tax on $50,000 | Per cent tax on excess between $50,000 and $56,000 for 1934-9 and between $50,000 and $60,000 for 1940-44. | Tax on $100,000 | Per cent tax on excess between $100,000 and $150,000. |
|---|---|---|---|---|
| 1934, 1935 | $ 7,700 | 30 | 28,000 | 52 |
| 1936, 1937 1938, 1939 | 7,700 | 31 | 30,000 | 58 |
| 1940 | 11,780 | 44 | 36,780 | 58 |
| 1941 | 19,380 | 52 | 49,780 | 65 |
| 1942, 1943 | 23,240 | 66 | 59,140 | 79 |
| 1944 | 26,820 | 75 | 67,320 | 89 |

9. If the World had paid out its earned surplus in dividends during the years 1942 and 1943, it would have increased the surtax liability of its owner, Mr. Lorton, the amount of $69,520.35.

10. The income returns of the Company filed with the Bureau of Internal Revenue were filed on the accrual basis in keeping with the practice of the Company. There were accumulations of earned surplus in both 1942 and 1943 from which dividends could legally have been declared and paid.

## Conclusions of Law.

■ A. The Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 102, imposes a high surtax in addition to all other taxes upon corporations formed or availed of for the purpose of preventing the imposition of a surtax upon its shareholders through allowing earnings or profits to accumulate and not be distributed to its stockholders. The touchstone of liability under Sec. 102 is the purpose behind the accumulation of the income and not the consequence of the accumulation. Mertens, Federal Income Taxation, Sec. 40.08; DeMille v. Commissioner, 31 B.T.A. 1161, affirmed 9 Cir., 90 F.2d 12, certiorari denied 302 U.S. 713, 58 S.Ct. 32, 82 L.Ed. 551.

■ If there is an accumulation the purpose of preventing the imposition of a surtax upon shareholders may exist though the accumulation be not unreasonable for business needs (United Business Corporation v. Commissioner, 19 B.T.A. 809, 828, affirmed 2 Cir., 62 F.2d 754, certiorari denied 290 U.S. 635, 54 S.Ct. 53, 78 L.Ed. 552; Chicago Stock Yards Co. v. Commissioner, 41 B.T.A. 590, reversed, 1 Cir., 129 F.2d 937, reversed on other grounds, eo nomine Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086), or where there are other and more dominant motives (Helvering v. Chicago Stock Yards Co., supra; Trico Products Corporation v. Commissioner, 46 B.T.A. 346, affirmed 2 Cir., 137 F.2d 424, certiorari denied 320 U.S. 799, 64 S.Ct. 369, 88 L.Ed. 482), such as accumulations for anticipated expansion of the taxpayer's business.. Whitney Chain & Mfg. Co. v. Commissioner, 3 T.C. 1109, affirmed 2 Cir., 149 F.2d 936; Trico Products Corp. v. Commissioner, supra; Semagraph·Co. v. Commissioner, 4 Cir., 152 F.2d 62.

■■ The testimony of interested witnesses of the purpose, motive or intent must be given consideration and accorded the weight to which it is entitled but it may be less persuasive than the surrounding circumstances. Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; R. L. Blaffer & Co. v. Commissioner, 37 B.T.A. 851, affirmed 5 Cir., 103 F.2d 487, certiorari denied 308 U.S. 576, 60 S.Ct. 91, 84 L.Ed. 469; Cecil B. DeMille v. Commissioner, supra. Circumstances bearing upon the question are:

(i) Substantial loans to controlling stockholders or to the sole owners.

(ii) The fact that the corporation could have been assured capital to meet its demands, including contemplated expansions, as well by a distribution of the earnings, profits and liquid reserve to the owner, the sole stockholder, as though such profits and earnings had been held in the corporate treasury. (Clearly this is so where all the stock except qualifying shares is owned by one stockholder. Helvering v. National Grocery Co., supra; Helvering v. Chicago Stock Yards Co., supra; and see Universal Steel Co. v. Commissioner, 5 T.C. 627; Southland Industries, Inc. v. Commissioner, 7 T.C. 1488; Semagraph Co. v. Commissioner, supra.)

(iii) The substantial increase under the law of surtax rates on income of individuals for the years 1942 and 1943 (United Business Corporation v. Commissioner, supra).

(iiii) An apparent increase in the surtax liability of the sole stockholder or controlling stockholders if the earnings and profits had been distributed out of surplus in dividends. Helvering v. National Grocery Co., supra; Trico Products Co. v. Commisisoner, supra; Trico Products Corp. v. McGowan, D.C.N.Y., 67 F.Supp. 311; McCutchin Drilling Co. v. Commissioner, 2 T.C. 1269, affirmed 5 Cir., 143 F.2d 480. And

(iiiii) The fact that the corporation's owner had substantial income and did not need distribution of earnings from the cor-

poration. Trico Products Corporation v. Commissioner, supra; Trico Products Corporation v. McGowan, supra.

However, the determination of the purpose need not rest on such circumstances alone.

### Growth and Expansion of "The World Publishing Co."

11. In the beginning, the World published, owned and operated a modest newspaper and printing plant but one adequate for the needs of Tulsa and its trade territories. The growth of the World corresponded in a large measure to the growth of Tulsa. Tulsa was a city of 19,500 in 1910, with the usual business activities of a city of that size in the Southwest. By 1940 it became a city of 188,562 in population. It had acquired a number of important industries, the chief of which was oil and its attendant activities. There was also a wholesale and retail growth of considerable importance.

12. Commensurate with the growth of Tulsa and its trade territories, and consistent. with able management, the circulation of the paper grew. From 1910 to 1945 the circulation grew from a week-day subscription of 7000 to over 70,000 and to a Sunday issue of 110,000. Because of the increased circulation and the increased demands of the community, it was necessary from time to time to increase the equipment and facilities of the newspaper. It outgrew its quarters and facilities in 1913 and procured other quarters. It secured improved printing equipment in 1917. At about this time, to house its printing establishment, a five-story building was erected, known as the World Building. This was raised to nine stories in 1927. The purchase of the necessary printing presses, type-setting units and other equipment kept pace with the increasing demands. Early in January of 1940, the World purchased an adjoining lot to that owned by it, and upon which the World Building had been constructed, for the purpose of further expansion of the plant.

13. It was the practice to pay for the new building and equipment from the earnings of the Company, and to a large extent, the earnings of the Company went back into or were held for the expansion of the plant in order to meet its increased needs.

14. The Tulsa Tribune was a newspaper published in Tulsa during this time, which likewise benefited from the growth of Tulsa. In the month of June, 1941, the two newspapers merged their mechanical, circulation, and business departments, and thereafter these activities were conducted in the World Building and by the World's operating equipment. The medium for the operation of these activities was the Newspaper Printing Company, an agency corporation. At first the result of the merger did not evidence any increase in the net earnings of the two papers, but in 1942 and 1943 the more economical operation under the merger began to reflect very favorably in the profits.

15. The printing merger increased the demands upon the printing and mechanical facilities of the World. During the year 1942, and prior thereto, the acquisition of a new and modern press by the World was considered. Such a plant, because of its size and mechanical constructions, required a building built for the purpose of housing the plant. It was decided to build an addition to the World Building upon the adjacent lot purchased in 1940, a suitable location for the improvement. In keeping with the practice of paying for such improvements out of its earnings, the Publishing Company had begun accumulating a fund for that purpose.

16. The inadequacy of the printing press and the necessity for making provisions for a new press, accessory machinery and other equipment, and a suitable building for housing the improvements, were discussed at a meeting of the directors in December of 1939. At that time, a resolution to set aside a fund for the purpose was passed. The advisability of increasing facilities was further discussed on December 21, 1941,[1] and

---

[1] Minutes of Special Meeting of Directors, Stipulation of Facts Ex G, the pertinent portion of which reads,—

"The president stated that he had already made extensive inquiries as to the probable minimum cost of the presses, together with a building suitable to house them and the necessary equipment re-

the approximate cost considered. There was also a discussion of the possibility of a diminution of the income of the Company without any reduction of the taxes, and the advisability of creating a fund to meet the demands of the business. Accordingly, a resolution was passed to withhold dividends and to set aside $150,000 for the purchasing of the press and accessory equipment, and $100,000 for the press building, bringing the earmarked accumulations for expansion to $500,000.

17. In January of 1944, another directors meeting was held and the past negotiations that had then taken place for a new press were related and considered. It was there considered that the sooner an order was made, the sooner it would be on the post-war schedule of press manufacturers, and that plans should be developed as soon as possible for the construction of the new building. Thereafter steps were taken to place an order with a press manufacturing company. That there was a reasonable, though not acute, need for a new press,[2] accessory machinery and the housing unit therefor in 1942, there can be no doubt.

18. There were some negotiations for the purchase of a new press in 1942, and these negotiations continued from time to time during subsequent years with various manufacturers until a contract for the press was entered into and a deposit made thereupon on or about May 25, 1945.

19. During the same time, plans were formed for the demolition of the old structure on the recently acquired lot and for the erection of the new building for the housing of the new press, and other accessory equipment.

20. The anticipated minimum cost of the new press and accessory equipment at the end of 1942 was $350,000. Of this amount the World was to bear one-half and the Tribune one-half. Expansion plans were one phase of the formation of the joint agency corporation. There was some speculation by the witnesses that the Tribune would be unable to advance its half of the obligation at once necessitating the World's putting up the entire amount at the outset, but the Tribune's half is not a part of the reasonable needs of the World's business. The cost of the housing unit which was to be borne solely by the World, was estimated at $150,000 in 1942. It was probable that the cost of the contemplated expansion would exceed the above estimated cost.

21. For the year 1942 the World set

---

quired to be installed therewith. As a result of his inquiries and investigations, he stated that, in his opinion, based on current prices, a minimum outlay of $350,-000.00 would be required for the purchase of presses and at least $150,000.00 would be required to properly erect a building suitable for the housing of the presses and acquisition of the accessory equipment incident thereto.

"The President stated he was not unmindful of the fact that, due to the priorities existent as a result of the war, a program of this nature could not be effectuated until after cessation of hostilities, and for that reason the financial welfare of the Company can only be protected in the most effective way by an action of the Board of Directors at this time authorizing a special minimum appropriation of $500,000.00 out of the accumulated earnings and profits of the Company to be used only for the purposes he had theretofore enumerated.

"The President further stated that, in conjunction with the appropriation of earned surplus for the mandatory requirements, they give earnest consideration to the whole problem of conservation of the Company's cash resources at this time. During the discussion which followed, he specifically pointed out that, in his opinion, there was a grave possibility the exigencies of the war would cause a material diminution in the future net profits of the Company without a material lessening of the federal and state tax burden. Also, a consideration should be given to the cash requirements of the Company, should additional facilities be required, as the result of future changes in the art, to maintain the present standard of excellence the Company now enjoys."

2 "The need for new presses appears to be real, and it is the Examiner's opinion that they will be installed as soon as practicable after the termination of the war. The Examiner is not familiar with the costs of such equipment, and he is unprepared to state whether the costs as estimated by Mr. Lorton represent reasonable peace time costs or whether they contain an element of increased costs due to war-time influences." Report of Internal Revenue Examiner, Pl. Ex. 1, Schedule 3–A, p. 11.

aside its earnings for the expansion program and did not pay any dividends. The Commissioner determined the net income for the year 1942 to be $133,026.43, and subject to a federal income tax, exclusive of the surtax on undistributed surplus under Section 102, of $52,595.84. The balance of $80,430.59 was held subject to the Section 102 surtax which amounted to $22,118.41. Upon the deficiency being declared, the taxpayer paid the amount thereof, with interest, and in due time made application for refund.

22. For the year 1943, the net earnings were set aside for use in the expansion program. The Commissioner fixed the net income at $247,351.18. Deducting therefrom the federal income tax, exclusive of surtax on undistributed earnings, of $46,320.58, and the income of $130,033.16 subject to excess profits tax, a balance remained of $70,997.44. That amount was subjected to undistributed surplus tax under Section 102 in the amount of $19,524.30. The deficiency tax was paid with interest, and in due time application for refund was filed by the taxpayer.

23. The book value of the investments in stocks, bonds and cash over liabilities on December 31, 1941, was $427,287.39 and the fair market value of the same items, exclusive of the claim for taxes under Section 102, on December 31, 1942, was $496,168.65, and on December 31, 1943, $645,878.61. Book value is given for the close of 1941 as the market value is not shown by the record. Book value for that year is sufficient for our purpose. These balances are persuasive that sufficient assets were on hand to carry out the desired expansion program. The accumulated earned surplus shown on the corporation's books as of the end of each year was as follows: 1941, $562,521.98; 1942, $643,062.26; 1943, $739,626.47. Thus, at the *beginning* of 1942 the accrued surplus was greater than the December 21, 1942, estimate of the minimum cost of the new press, accessory equipment and the cost of building the housing unit— even disregarding the obligation of the Tribune to bear half of the cost of the press and allied equipment.

24. Testimony was received that several hundred thousand dollars working capital was necessary in the business, thus establishing the sum available for the expansion program below its 1942 estimated cost. Since the successful formation of the joint printing enterprise, however, that figure is wholly unreasonable. The Newspaper Printing Corporation handled the part of the business wherein the testimony showed substantial working capital was needed, and since the original advance to it of $60,000 by each the World and the Tribune no further advances are reflected in the World balance sheets, and beginning in 1942 The Newspaper Printing Corporation did nothing but return bountiful profits to each of the newspapers. The successful operation of this Company on the funds furnished showed that exclusive of a nominal amount to maintain the World's editorial staff no additional working capital was needed by the World Publishing Company.

25. Any inference that the figure representing Reserve for Depreciation should be subtracted from surplus before calculating the sum available for expansion is unreasonable here. The construction of taxpayer's books as well as general accounting practice in relation to such a reserve set it up as a charge against the assets depreciated. It is clearly treated as a valuation reserve. Were it a replacement or funded reserve, as taxpayer apparently seeks to treat it now, the books and balance sheet of the World should so indicate. Moreover, it would be unusual for a business of this kind to maintain a funded reserve for depreciation. The depreciation is slow and regular; the assets, its building and press equipment, are not subject to frequent replacement from rapid deterioration or obsolescence. The old presses and that part of the old buildings housing them were not to be abandoned but used as standby facilities and on special jobs. They would have substantial value. The taxpayer may not deduct its Reserve for Depreciation or any part of it from surplus to determine the amount available for the expansion program at the dates in question.

26. The minutes of the Directors Meeting of December 21, 1942, and other testimony upon the possibility of diminution in future profits because of the exigencies,

priorities and material shortages of war are offered as further reason for retaining the corporate earnings. In the case of this taxpayer at the end of 1942 and of 1943, it was unreasonable that further accumulation to the $562,521.98 surplus per books as of the end of 1941 would become necessary for that reason. Recall also the book value excess of stocks, bonds and cash over liabilities of $427,287.39 at the end of 1941. This company was strong, both currently and historically. It had no debts except current operating ones. It had virtually no competition. The size and wealth of its circulation territory had been constantly growing. As a result of its printing arrangement with the Tribune, its 1942 net earnings almost trebled its previous 8-year average—even after deducting high war-time taxes—and more than trebled it in 1943. It faced no substantial change in the art, no sudden loss of any substantial part of its source of revenue. The basis of its revenue was broad and stable. None of the operating materials it had to buy nor the product and service it had to sell were subject to serious fluctuations in price. Its business depended on the life of no patents. It was concerned with no erratic investment values. The possibility of labor unrest was not a serious problem. Legislation adverse to the prosperity of the business was not in prospect. It was a type of business which the war affected comparatively slightly in its day-to-day operations. It had none of the problems of conversion into wartime production and post-war re-conversion. Restriction of foreign commerce could affect it little. It encountered some shortages, such as gasoline, tires, automotive equipment and newsprint, but they did not put the newspaper business in a financially precarious position, or indicate any financial uncertainty for the future.

27. The Second World War began on December 7, 1941. Thereafter, it was impossible to secure the desired equipment for the expansion program. According to the minutes of December, 1942, it was realized that "a program of this nature could not be effectuated until after cessation of hostilities * * *" and that we were in the midst of a "protracted war." Likewise the minutes of the January, 1944, meeting reflected that the consummation of the company's expansion program lay in the indefinite post-war future.

28. It did not appear reasonable to presume that war could end during the year 1943. There was some speculation of an ending in the summer of 1944. Therefore, there could have been no anticipation of the possibility of making the contracts for purchase of such heavy equipment as presses or of acutely scarce building materials for the housing unit until there was a reasonable prospect of the ending of the war.

29. The claim of need for conservation for war contingencies in 1942 and 1943 further illuminates the view the taxpayer took then of its need for expansion. The state of the times in 1942 and 1943 would not have permitted needs for both to stand side by side. Though the first may have justified a need for some accumulation, perhaps as much as the World had on hand at the beginning of 1942, the apprehension it reflected negatived any reasonable expectation of fulfillment of an expansion program in the immediate future.

30. Moreover, the expansion program considered by the taxpayer was not such a project that could be accomplished quickly following the making of a contract so that it would call for the entire cost in cash virtually all at once and on the contract date, or even within the space of a few months. The manufacturer of the press would have to reconvert from wartime assignment, make a detailed design and then manufacture the press. Except the small down payment, the payment for the press would not be made until delivery. As the building must be built around the press it could not be begun until after the press was ordered. Much time would elapse before the cash outlay for the building, too, would be necessary.

31. A contract supported by a down payment was entered into by the taxpayer for the press on May 25, 1945. The old building on the lot upon which the housing for the new press is to be built was demolished in the latter part of 1946. The present plans call for the erection of the building and the installation of the equip-

ment by the summer of 1947, at a cost of $635,000 for the press, accessory equipment and installation and approximately $300,000 for the building. The press contract obligated the World to pay the entire cost of the press, although by separate agreement with the Tribune, the latter will ultimately bear one-half of the cost.

32. The accumulation of the surplus profits of 1942 and 1943 was in excess of the reasonable needs of the business because of the adequacy of the previously accrued surplus and the necessary remoteness of the contemplated expansion at that time.

33. The proposed venture into the radio broadcasting business was not a part of the needs of this business. The same finding as to remoteness would also strike such a venture down as a purpose for the accumulation by the World in 1942 and 1943.

■ B. The fact that the earnings or profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon the shareholders. The Commissioner's determination that the corporation was availed of for such purpose may only be overcome and set aside by a clear preponderance of the evidence. 26 U.S.C. A. Internal Revenue Code, § 102. Treasury Regulation, Sec. 29.102—2, Reg. III; Universal Steel Co. v. Commissioner, 5 T.C. 627, 637; Whitney Chain & Mfg. Co., 3 T. C. 1109, affirmed, 2 Cir., 149 F.2d 936; and, as to the less strongly worded but similarly applied provision of the Code prior to the 1938 Act, see United Business Corporation v. Commissioner, 2 Cir., 62 F.2d 754, certiorari denied 290 U.S. 635, 54 S.Ct. 53, 78 L. Ed. 552; Trico Products Corp. v. Commissioner, 46 B.T.A. 346, affirmed 2 Cir., 137 F.2d 424, certiorari denied 320 U.S. 799, 64 S.Ct. 369, 88 L.Ed. 482.

■ Whether an accumulation of profits or earnings by a corporation was beyond the reasonable needs of the business is a question of fact in each case (J. M. Perry & Co. v. Commissioner, 9 Cir., 120 F.2d 123; Corporate Investment Co. v. Commissioner, 40 B.T.A. 1156; Gunlocke Chair Co. v. Commissioner, 2 Cir., 145 F.2d 791; Universal Steel Co. v. Com-

missioner, supra; Commissioner v. De-Mille, 9 Cir., 90 F.2d 12, certiorari denied 302 U.S. 713, 58 S.Ct. 32, 82 L.Ed. 551; Becton, Dickinson & Co. v. Commissioner, 3 Cir., 134 F.2d 354; Almours Securities, Inc. v. Commissioner, 5 Cir., 91 F.2d 427, certiorari denied 302 U.S. 765, 58 S.Ct. 476, 82 L.Ed. 594) to be decided upon the nature of the corporate business, the volume of corporate business, the keenness of competition, the principles of good business management, the conditions of the times, the possibilities of harmful legislation affecting the industry, and other circumstances. Seaboard Security Co. v. Commissioner, 38 B.T.A. 560; William C. DeMille Productions, Inc. v. Commissioner, 30 B.T. A. 826, Id., 80 F.2d 1010.

■ The determination of the question in the instant case depends chiefly upon the sufficiency of the funds for the expansion plan in the corporate treasury before adding the profits of 1942 and 1943, and the immediacy of the need for any funds, or more specifically, for the 1942 and 1943 additions to the accumulation. While the directors are entitled to exercise their judgment upon the question (Trico Products Corp. v. Commissioner, supra, 46 B.T.A. 375), the determination is truly a judicial question (United Business Corporation v. Commissioner, supra; and see United States v. Ragan, 314 U.S. 513, 62 S.Ct. 374, 86 L. Ed. 383; Schepp Co. v. Commissioner, 25 B.T.A. 419, 429) to be decided in the light of the circumstances and the applicable rules. The corporate exercise of judgment must succumb whenever it conflicts with the governmental policy as enacted by the Congress. Trico Products Corp. v. McGowan, D.C.N.Y., 67 F.Supp. 311, 321; United Business Corporation v. Commissioner, supra.

■ The Statute contemplates immediate need to carry out the corporate plan. McCutchin Drilling Co. v. Commissioner, 2 T.C. 1269; Trico Products Corp. v. McGowan, supra; Southland Industries, Inc., v. Commissioner, 7 T.C. 1488; and see Wilson Bros. & Co. v. Commissioner, 9 Cir., 124 F.2d 606; General Smelting Co. v. Commissioner, 4 T.C. 313, where the converse of the instant situation resulted in the

Court's refusal to allow assessment of the Section 102 tax.

In determining the reasonableness of corporate accumulations for business and expansion needs the amount of surplus previously accumulated (Mertens, Federal Income Taxation, Sec. 40.01; Trico Products Corp. v. Commissioner, supra; Southland Industries, Inc. v. Commissioner, supra; Corporate Investment Co. v. Commissioner, supra; Dill Mfg. Co. v. Commissioner, 39 B.T.A. 1023), the rate of current earnings (Trico Products Co. v. Commissioner, supra) and the quick assets on hand are significant.

As the World could not have used the accumulations for its planned expansion during 1942, 1943 or a reasonable time thereafter and as there was adequate surplus previously accumulated to meet all reasonable demands, the plaintiff has failed to overcome by a preponderance of the evidence the finding of the Commissioner and the tax must stand.[3]

Judgment will be entered on these findings of fact and conclusions of law as of the date of filing, this 16th day of May, 1947.

---

[3] Such cases as Wean Engineering Co., Inc., v. Commissioner, 2 T.C. 1270; Howard Flint Co. v. Commissioner, 47 B.T.A. 1043; L. R. Teeple Co. v. Commissioner, 47 B.T.A. 270; Baker & Co. v. Commissioner, 2 T.C. 1267; Dietze & Co. v. Commissioner, 1 T.C. 1213; Dill Mfg. Co. v. Commissioner, 39 B.T.A. 1023; Steele's Mills v. Robertson [no opinion for publication] D.C.N.C., 32 A.F.T.R. 1734; General Smelting Co. v. Commissioner, 4 T.C. 313; and Universal Steel Co. v. Commissioner, 5 T.C. 627, in all of which the court refused to apply the Section 102 surtax, are too clearly distinguishable on the facts pertaining to what constituted the needs of the business to control this case. They serve rather, by the distinctions, to sustain and enforce the conclusions reached here.