## R. C. TWAY COAL SALES CO. v. UNITED STATES.

District Court, W. D. Kentucky.

Jan. 7, 1933.

Selligman, Selligman & Goldsmith, of Louisville, Ky., and Miller & Chevalier, of Washington, D. C., for plaintiff.

T. J. Sparks, U. S. Atty., and Frank A. Ropke, Asst. U. S. Atty., both of Louisville, Ky., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, W. F. Evans, Sp. Atty., Bureau of Internal Revenue, and Herbert E. Carnes, Sp. Atty., Bureau of Internal Revenue, all of Washington, D. C., for the United States.

DAWSON, District Judge.

In this action the plaintiff seeks to recover $23,818.39 as a refund of taxes claimed to have been illegally collected from it for the years 1922 and 1923.

The taxes were assessed against and collected from the plaintiff by the Commissioner under section 220 of the Revenue Act of 1921 (42 Stat. 247).

The material facts are as follows: Plaintiff is a Kentucky corporation organized in 1918. Its charter authorized it to engage in mining and selling coal, and numerous other activities ordinarily incident or related to coal mining operations. The charter does not specifically authorize it to engage in the business of buying and selling securities, and it is doubtful if any such authority can be implied from the language of the charter.

In 1922 the company had a paid-in capital of $90,000, represented by 900 shares of the par value of $100 each. R. C. Tway owned 630 shares, his wife 250 shares, and L. A. Schaeffer and C. H. Clark 10 shares each.

Prior to 1920 the company was engaged exclusively in the coal brokerage business. It sold all the coal mined by the R. C. Tway Coal Company, substantially all the stock of which was owned by R. C. Tway, and also sold considerable quantities of coal produced by other mines in which Tway had no interest. The plaintiff conducted its business in this way: It would make a sale of a quantity of coal, and would then secure the coal from some mine and direct it to be shipped to the customer directly from the mine of the producing company. The price at which the mine sold the coal was charged to the plaintiff, and the plaintiff in turn billed the customer, and when collection was made deduct-

ed its commission of 8 per cent. and charged itself, and credited the producing mining company with the balance. The plaintiff never ordered or purchased coal from the producing mine until it had already sold the coal to some customer. The producing coal companies, including the R. C. Tway Coal Company, looked alone to the plaintiff for their pay, and if any customer to whom coal was shipped by any of the producing companies upon order of the plaintiff failed to pay his account, the loss was that of the plaintiff—not of the producing company. The plaintiff sold the coal on thirty, sixty, and ninety days' time, but there was no arrangement or understanding by which any of the companies furnishing the coal sold by plaintiff should wait until the plaintiff collected from its customers. The single exception to this practice was a shipment of coal purchased by the plaintiff from R. C. Tway Coal Company in 1921 for storage at one of the Great Lake ports. From the beginning of its business, however, there was always, in proportion to the business done, a large balance due by the plaintiff to the R. C. Tway Coal Company and other coal companies on account of coal furnished on plaintiff's order.

As of December 31, 1919, the amount due to R. C. Tway Coal Company was, in round numbers, $38,000; to other coal companies $13,000.

December 31, 1920, to R. C. Tway Coal Company $222,000; to other coal companies $27,000.

December 31, 1921, to R. C. Tway Coal Company $344,000; to other coal companies $27,000.

December 31, 1922, to R. C. Tway Coal Company $283,000; to other coal companies $62,000.

December 31, 1923, to R. C. Tway Coal Company $396,000; to other coal companies $26,000.

December 31, 1924, to R. C. Tway Coal Company $472,000; to other coal companies $34,000.

In 1922 the plaintiff sold $570,615 worth of coal, all of which came from the R. C. Tway Coal Company except $172,458 worth, and in 1923 the total coal sales amounted to $539,930.

In 1920 the company's first dealings in securities took place, and from that time on it bought and sold securities quite extensively. The securities were not purchased in the name of the company. The actual purchasing was done by R. C. Tway, president of the company, in his own name, which he explains was done to facilitate transfers of the securities when they were sold. The funds with which to purchase these securities were withdrawn from the company when available, and charged to an account carried on the books of the company as "R. C. Tway Special." Sometimes Tway advanced his own funds, in which case a proper entry was made on the books of the company to his credit, and sometimes the money was borrowed from the bank by Tway individually, for the company, in which event the books of the company properly reflected the transaction by giving credit to the "R. C. Tway Special" account. In all cases where the money was advanced by the company the total was charged on the books of the company to the "R. C. Tway Special" account, and when the securities were purchased for the company, that account was then given credit for the cost price of the securities. All dividends from securities thus purchased were turned over by Tway to the company, and the proceeds of all sales were likewise turned over to the company and all income realized from trading in securities was reported and accounted for by the plaintiff in its income tax reports.

Tway, in addition to his salary, drew money from the company for his own personal use, which was charged to him on the company's books as an overdraft, his overdraft in this respect at the end of 1919 being, in round numbers, $19,000; $42,000 in 1920; $44,000 in 1921; $157,000 in 1922; and $204,000 in 1923. At the end of 1930 this overdraft was, in round numbers, $462,000. He was charged on the company's books with interest on his overdrafts, and from time to time he made payments on his overdrafts. In 1922 the payments thus made aggregated, in round numbers, $34,000; in 1923 $18,000; and altogether up to December, 1930, he had repaid a total of $338,000 on these overdrafts. The monthly average of stocks carried on the books of the corporation, at cost, in 1922 was $217,942 and in 1923 $473,024, and the bank borrowings, for the purpose of carrying these stocks, at the end of 1922 were $217,000, and at the end of 1923 $225,000.

In 1920 the plaintiff had a net taxable income of $47,607, with an invested capital of $107,000, and paid an income and excess profits tax of $15,756. In the same year Mr. R. C. Tway, the largest stockholder, had a taxable income of $26,000. The surplus of the plaintiff at the end of 1918 was $3,841; at the end of 1919, $16,116; 1920, $47,968; 1921, $72,363; 1922, $104,869; 1923, $145,411. Its highest surplus was $170,070 at the end of 1924, and its surplus at the end of

1931 had dwindled to $32,260. In 1922 the corporation paid a dividend of 20 per cent., amounting to $18,000, which was 35.64 per cent. of its earnings, and a like dividend in 1923, which was 30.25 per cent. of its earnings. Dividends were paid in each of the succeeding years through 1929, but the dividends for 1925, 1927, and 1928 were, in part, paid out of accumulated surplus.

Plaintiff realized a profit from its coal business in 1918 of $4,229; 1919, $11,143; 1920, $40,947; 1921, $9,434; 1922, $7,966, and from the sale of securities $20,779; in 1923, $3,328 from coal and $26,909 from the sale of securities. In 1924 it sustained a loss of $47,097 in its coal business and a profit of $28,301 in its securities business. From 1923 to 1931, inclusive, plaintiff's coal business showed a total loss of around $6,500, and its securities transactions during the same period a total loss of about $125,000.

In 1921 the plaintiff received as dividends on securities purchased and held in the manner heretofore described $9,950; in 1922, $18,717; in 1923, $25,017. These dividends, of course, were nontaxable to the corporation. The plaintiff had no plant equipment except a small amount of office furniture and fixtures, and during 1922 and 1923 no investment in plant equipment was contemplated.

The balance sheet of the corporation in 1922, taking into consideration the Tway overdrafts, showed a ratio of quick assets to liabilities of 1.31, and for the year 1923 of 1.34.

It was on this state of facts that the Commissioner certified that in his opinion the accumulations of earnings for the years 1922 and 1923 were unreasonable for the purposes of the plaintiff's business, and exacted the payment for each of those years of the additional tax authorized by section 220 of the Revenue Act of 1921. Section 220 reads as follows:

"That if any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its stockholders or members through the medium of permitting its gains' and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 25 per centum of the amount thereof, which shall be in addition to the tax imposed by section 230 of this title and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penal-

ties, as that tax: Provided, That if all the stockholders or members of such corporation agree thereto, the Commissioner may, in lieu of all income, war-profits and excess-profits taxes imposed upon the corporation for the taxable year, tax the stockholders or members of such corporation upon their distributive shares in the net income of the corporation for the taxable year in the same manner as provided in subdivision (a) of section 218 in the case of members of a partnership. The fact that any corporation is a mere holding company, or that the gains and profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax; but the fact that the gains and profits are in any case permitted to accumulate and become surplus shall not be construed as evidence of a purpose to escape the tax in such case unless the Commissioner certifies that in his opinion such accumulation is unreasonable for the purposes of the business. When requested by the Commissioner, or any collector, every corporation shall forward to him a correct statement of such gains and profits and the names and addresses of the individuals or shareholders who would be entitled to the same if divided or distributed, and of the amounts that would be payable to each."

Counsel for the defendant in his brief states that the defendant "makes no contention that the R. C. Tway Coal Sales Company was formed for the purpose of preventing the imposition of surtax against its stockholders. It is the contention of the defendant that it was availed of for such purpose through the medium of permitting its gains and profits to accumulate instead of being distributed." Counsel for the government then undertakes to sustain the imposition of the tax upon the theory that the corporation was a mere dummy to cover up the individual transactions of R. C. Tway, and that all the securities dealings involved in this case were, in reality, the dealings of R. C. Tway as an individual.

It might be remarked in passing that if such is the government's theory, it would seem that the Commissioner entirely misconceived his duty in the premises. Instead of proceeding under section 220, which authorizes an additional tax against the corporation for unreasonably withholding distribution of its earnings in order to save its stockholders from the imposition of surtaxes, he should have proceeded under section 250 of the Revenue Act of 1921 (42 Stat. 265) against R. C. Tway individually, for falsely and fraudulently failing to report a part of his

income. Inasmuch as the Commissioner imposed the tax under section 220, and relies upon that section to sustain his action, the rights of the parties must be determined by the application of that section to the facts, and not by the application of section 250.

At the outset it must be conceded that under this record R. C. Tway cannot be regarded as the sole owner of the corporation, even if that matter were one of materiality here. His wife owned in her own right 250 shares out of the total issue, and notwithstanding the close relationship of husband and wife, the law of this state no longer assumes that the wife's property is under the domination of the husband. This case must be decided upon the assumption that the R. C. Tway Coal Sales Company was a bona fide corporation, in which Tway owned a majority of the stock, but in which other stockholders held a substantial stock interest.

 A careful study of section 220 discloses that before there can be an assessment under its provisions, in a case such as the one presented here, there must be not only an accumulation of gains and profits beyond the reasonable business needs of the corporation, but such accumulation must have been permitted by the corporation with the intention and for the purpose of enabling its stockholders to evade the payment of surtaxes on dividends which otherwise would have been distributed to them. Even if it should clearly appear that the accumulations were in excess of the reasonable needs of the corporate business, section 220 would not apply unless it further appears that the accumulations were intentionally permitted for the express purpose of enabling the stockholders to evade the surtax. It is true the statute provides that the certificate of the Commissioner that in his opinion the accumulations are unreasonable for the purposes of the business is prima facie evidence of a purpose to evade the tax; but in a suit for a refund of taxes collected under this section, the plaintiff always has the right to overcome this prima facie presumption by proof. This, it seems to me, the plaintiff has successfully done, even if the defendant is correct in its contention that in determining the reasonable needs of plaintiff's business consideration can be given only to its coal business. Necessarily, the directors and officers of a corporation must be given, even in federal tax matters, some discretion and some latitude as to what constitutes the reasonable needs of the corporate business. It may well be doubted if the federal government, for the purpose of increasing its taxes, can absolutely destroy or arbitrarily limit this discretion resting in the directors of a corporation organized under state law. Notwithstanding the contention of the defendant to the contrary, it seems to me this record abundantly establishes that in the dealings between the plaintiff taxpayer and R. C. Tway Coal Company, the two corporations must be regarded as separate entities and the accounts owed to the coal company for coal furnished on the orders of the plaintiff taxpayer can be regarded in no other light than as real outstanding accounts; and that the money due to the plaintiff taxpayer from customers who bought coal which had been furnished by R. C. Tway Coal Company represented accounts receivable belonging to the plaintiff, and not to the R. C. Tway Coal Company.

 In this view of the situation, in both the years 1922 and 1923, the outstanding accounts receivable in favor of the plaintiff were greatly in excess of its entire capital and surplus. It would indeed be a harsh and unreasonable construction of section 220 to hold that its provisions penalize a corporation such as the plaintiff for accumulating a surplus, which, when added to its capital, does not equal its current accounts receivable. According to the evidence in this case, these accounts represent the price of coal sold on thirty, sixty, and ninety days' time, and, while the record shows that the R. C. Tway Coal Company, as well as the other coal companies which furnished coal to the plaintiff, had not been in the habit of exacting immediate payment for coal furnished by them to the plaintiff, there is nothing to show that they did not have the right so to do had the exigencies of their business demanded such payment. Certainly, it would not seem to be an unreasonable act on the part of the plaintiff's directors and officers to permit the accumulation of a surplus sufficiently large to meet the possible requirement to pay for the coal obtained by it from the Tway Coal Company and others before its customers had paid their accounts. Furthermore, I am of the opinion that in determining the reasonableness of the accumulations for the years involved, the court is not confined to the needs of the plaintiff's coal business alone. I think it is quite clear that the plaintiff is not expressly or impliedly authorized by its charter to engage in the securities business; but the federal government, it seems to me, has no authority to raise this question, as plaintiff is a Kentucky corporation, not a federal corporation. This question, however, is of very doubtful materiality, although it would have been material had this case involved an ad-

ditional tax assessed against R. C. Tway under section 250 of the Revenue Act of 1921, as in such a case proof of want of authority in the corporation to engage in the securities business would have been some evidence that these transactions were actually the business of R. C. Tway. The income which the corporation received from its securities business for each of the years in question, as well as all subsequent years, was reported for income tax purposes and was taxed as income of the corporation, and such it was. Even if illegally earned, it was still corporate income. Indeed, the very tax imposed by the Commissioner under section 220 was based upon the income of the plaintiff for those years derived from its securities business, as well as its coal business. If the Commissioner regarded the securities business of the corporation as that of Mr. Tway, he had no right to tax the profits thereof under section 220. By proceeding against the corporation under section 220, the government is committed to the view that the profits from the securities branch of the business was income of the corporation. If it was income of the corporation, it seems to me it must necessarily follow that in determining the reasonable needs of the corporate business under section 220, the Commissioner must take into consideration all branches of the taxpayer's business, the profits of which formed the basis for the imposition of the tax under section 220. Section 220 surely does not contemplate that under its terms the Commissioner may exclude from consideration the needs of an unauthorized branch of a corporation's business in determining if the accumulation of surplus is in excess of the needs of the business, and then impose a tax of 25 per cent. on corporate profits and gains, including the profits from the unauthorized business. If the unauthorized business can be considered under section 220, in determining the amount of tax to be imposed on corporate income, certainly the most elementary principles of fair dealing would construe the law to mean that the needs of the unauthorized branch of the business must be considered in determining if the accumulation is unreasonable.

I do not understand that the government contends that the accumulation for the years in question was unreasonable, if the needs of the securities branch of the plaintiff's business, as well as its coal business, can be taken into consideration.

Plaintiff is entitled to the relief sought, and counsel may prepare and present for entry a finding of facts and judgment conforming to the views herein expressed.