### TRICO PRODUCTS CORPORATION v. McGOWAN, Collector of Internal Revenue.

#### Civil Action No. 1999.

District Court, W. D. New York.

July 3, 1946.

Kenefick, Cooke, Mitchell, Bass & Letch-worth, of Buffalo, N. Y., and Medina & Sherpick, of New York City (Harold R. Medina, of New York City, James McC. Mitchell, of Buffalo, N. Y., and Rupert Warren, William Gilbert, and Richard T. Davis, all of New York City, of counsel), for plaintiff.

George L. Grobe, U. S. Atty., and R. Norman Kirchgraber, Asst. U. S. Atty., both of Buffalo, N. Y., Harold D. Thomas, Sp. Atty. for Bureau of Internal Revenue, of Washington, D. C., Sewall Key, Acting Asst. Atty. Gen., and Andrew D. Sharpe, Homer Miller, and Michael Gould, Sp. Assts. to Atty. Gen., for defendant.

KNIGHT, District Judge.

This is an action for the refund of federal taxes paid under Section 102 of the' Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, page 851, by the plaintiff, a New York State corporation, to the defendant Collector of Internal Revenue for the 28th District of New York.

Plaintiff alleges three causes of action. In the first it demands judgment for $740,-918.28, paid to defendant on October 7, 1943, being the sum of $532,468 additional income tax for the calendar year 1936 and $208,450.28 interest. In the second it demands judgment for $980.46, being the sum of $704.62 excessive payment made to defendant on October 7, 1943, because of failure to allow a deduction of $11,743.65, as alleged in the first cause of action, and $275.84 interest. In the third it demands judgment for $801,710.29, paid to defendant on October 7, 1943, being the sum of $602,119.91 additional income tax for the calendar year 1937 and $199,590.38 interest.

The total amount of refund, exclusive of interest, demanded by plaintiff in its three causes of action is $1,543,609.03.

Since the Attorney General, after service of the answer, directed an administra-

tive refund of $11,341.02, plus interest, involving depreciation in patents, the only question now presented, according to defendant's brief, is: "Whether taxpayer in 1936 and 1937 was availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of Trico Securities Corporation through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed, as provided in Section 102, Revenue Act of 1936."

Section 102, Revenue Act of 1936, provided in part as follows:

"(a) Imposition of tax. There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this title) upon the net income of every corporation (other than a personal holding company as defined in section 351) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed—

"(1) In the case of corporations not subject to the surtax on undistributed profits imposed by section 14, a surtax equal to the sum of the following:

"25 per centum of the amount of the retained net income not in excess of $100,000, plus

"35 per centum of the amount of the retained net income in excess of $100,000.

"(2) In the case of corporations subject to the surtax on undistributed profits imposed by section 14, a surtax equal to the sum of the following:

"15 per centum of the amount of the retained net income not in excess of $100,000, plus

"25 per centum of the amount of the retained net income in excess of $100,000.

"(b) Prima facie evidence. The fact that any corporation is a mere holding or investment company, or that the earnings or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to avoid surtax upon shareholders."

Defendant's answer admits the allegation that "At no time was the plaintiff a mere holding or investment company."

Two questions must be decided in this case: (1) Did plaintiff during the calendar years 1936 and 1937 permit its earnings or profits to accumulate beyond the reasonable needs of its business? (2) If so, was this done to avoid surtax upon shareholders? If the first question is answered no, judgment must be rendered for the plaintiff.

The history of the plaintiff corporation prior to 1936 is reported in Trico Products Corp. v. Commissioner, 46 B.T.A. 346; Id., 2 Cir., 137 F.2d 424. From the facts there stated and the evidence in the instant case, the following may be deemed established:

Plaintiff's history begins with the organization of Tri-Continental Corporation in 1917. An automobile accident brought forcibly to the attention of John R. Oishei, now Trico's president, the need for some device to keep automobile windshields clear. He discovered that one John W. Jepson of Buffalo, New York, had invented a windshield wiper, which he was delivering in market baskets. Mr. Oishei then organized said corporation to distribute this wiper. He was joined by Dr. Peter C. Cornell and, with $10,000 borrowed capital, they began business. About eight or nine months after incorporation, the Tri-Continental bought Jepson's business and manufactured and distributed his wiper under the name "Rain Rubber." World War I proved disastrous to its business, which it tried to revive after the war ended. Car manufacturers had changed the construction of windshields and this had made the "Rain Rubber" unworkable. Mr. Oishei then invented a new type of wiper called the "Crescent Cleaner," which proved successful. To exploit this new invention, plaintiff was incorporated in New York State on April 26, 1920.

Plaintiff took over all the assets of the Tri-Continental. Its capitalization consisted of 7,500 shares of common and 2,500 shares of preferred stock. The certificate of incorporation provided:

"The Board of Directors shall have absolute discretion to determine, from time to

time, what sum shall be retained by the Corporation out of its · surplus profits * * * before the declaration of any dividend upon the common stock, as working capital for the Corporation, and the stockholders shall have no right·to insist upon the distribution of any profits so reserved by the Board of Directors."

Plaintiff still had insufficient capital and was hard pressed. Mr. Oishei then invented a power-operated wiper, known as the "Trico" and the sales of the hand-operated "Crescent Cleaner" increased. In 1924, plaintiff bought the assets of the defunct Polk-Hueber Company of Seattle to acquire its patent on an automatic windshield wiper known as the "Visionall."

From 1922 through 1925, plaintiff was subject to severe competition, particularly from Folberth Auto Specialty Company of Cleveland, which sued it for alleged patent infringement. It bought out the Folberth Company in 1925 for $1,000,000, and increased the number of its preferred shares to 15,000. In 1926 it secured a reissue of the Hueber patent after it had been determined by the Patent Office as between Folberth and Hueber that Hueber was the first inventor. In 1927 its basic patents on the vacuum-operated windshield wiper were judicially determined to be valid. Trico Products Corp. v. Perfection Products Co., D.C., 19 F.2d 173, affirmed 6 Cir., 31 F.2d 522. These patents expired on January 25, 1942.

By 1927 plaintiff had conquered the windshield wiper field. Pres. Oishei testified that in 1927, about 70% of all cars being produced, except Fords, were equipped with the Trico vacuum-operated wiper and the remaining cars with the Trico hand-operated wiper.

Since the organization of the Trico corporation, John R. Oishei has been its president and acting head. In 1927 plaintiff's outstanding common stock of 7,999.91 shares was held by 21 stockholders. Mr. Oishei and Dr. Cornell held 4,519.955 shares.

In 1927 a banking syndicate made a contract with plaintiff's 21 stockholders, a majority of whom had been interested in the business from the start. The terms of this contract are stated in Trico Products Corp. v. Commissioner, 2 Cir., 137 F.2d 424, 425, where it is said:

"Under the terms of this contract a recapitalization of (plaintiff) took place and resulted in the issuance of 225,000 shares of common stock without par value and entitled to share ratably in all dividends declared and of 450,000 shares of restricted stock without par value and entitled to share ratably in that part only of dividends which should be declared in excess of $2.50 in any one year on each of the free shares. There was no other kind of stock. The bankers agreed to, and did, purchase 175,-000 of the unrestricted shares for $4,225,-000 in cash; the twenty-one old stockholders took the rest of the unrestricted shares and all of the restricted shares were also taken by them. In accordance with the syndicate agreement all of the latter were put into a voting trust which provided for their release as free shares as follows:

" 'It is agreed that commencing January 1, 1928, up to 112,500 deferred shares may be exchanged for free shares accordingly as net earnings of the Company for the calendar year 1927 or for any year thereafter shall be equal to $5 per share upon the sum of the free shares then outstanding plus the number of free shares required for such exchange and in like manner commencing January 1, 1929, additional deferred shares up to 112,500 may be exchanged accordingly as the net earnings of the Company for the calendar year 1928 or for any year thereafter are equal to $6 per share on the sum of the free shares plus the free shares required upon such exchange and in like manner the remaining 225,000 deferred shares may be exchanged accordingly as the net earnings of the Company for the calendar year 1929 or for any year thereafter are equal to $9 per share on the sum of the then outstanding free shares plus free shares required upon such exchange; provided that as condition precedent to such exchange in 1928, dividends at the rate of $2.50 per share shall have been paid on the free shares from date of issuance and provided that at the date of each successive exchange herein provided for, dividends aggregating $2.50 shall have been

declared and paid during the then next preceding twelve months upon the free shares then outstanding.' "

The voting trust could be ended at any time by the concurrence of those holding a 60% interest in it. The trust was terminated in 1929 when the 21 old stockholders, who had continued to hold all the restricted stock, replaced it with the Trico Securities Corporation.

It was further agreed that plaintiff should have no debts except current ones; that its fixed assets should be not less than $1,100,000 with current assets of an equal amount; that the condition of the corporation as shown on its balance sheet of April 30, 1927, was not to be changed, except as changes might arise in the ordinary course of business. John R. Oishei agreed to and did assign to plaintiff all the patents which he owned in consideration of an annual salary of $150,000 and 10% of the net profits before payment of taxes for acting as manager. This continued until 1942, when it was changed.

The purchase price of the 175,000 shares ($4,225,000), after payment of certain expenses, was to be ratably distributed among the stockholders. Dividends upon the 225,000 shares of free stock up to but not exceeding $2.50 per share in each calendar year were to be paid before any payment of them upon the 450,000 restricted shares but all dividends in excess of $2.50 were to be declared and paid ratably upon the entire 675,000 shares.

Trico Securities Corporation was organized in 1929 "to take the place of the voting trust and acquired all the then restricted stock, amounting to 337,500 shares, from the original stockholders, who became stockholders of (it) in proportion to their holdings of the restricted shares." In 1936 and 1937, six of the original stockholders held 85% of these 337,500 shares. Trico Securities Corporation officers during these years were: John R. Oishei, president; Peter C. Cornell, vice-president; S. H. Evans, secretary. They and Ieuan Harris and Charles H. Oshei were directors. The Corporation owned 55% of plaintiff's stock in 1935, 1936 and 1937. Of plaintiff's 675,000 total shares, the original stockholders owned 416,633 shares in 1936, 425,160 shares in 1937 and 457,636 shares in 1938.

Plaintiff has paid a regular dividend of at least $2.50 each year since 1927 on all of the free shares outstanding. The total dividends from 1928 to 1941, inclusive, were $15,437,322.99. The dividends paid in 1936 were $2,210,894.88 and in 1937, $1,960,768.-77. In those years, because of the undistributed profits tax law, plaintiff declared an additional dividend of $1.375 on all shares. A fifth dividend of $.625 was paid in 1936 in order to receive a credit for distribution of dividends declared in the preceding year.

Plaintiff's original capital was $1,750,000. Its net income for 1927 to 1941, inclusive, was $38,731,218.57. In 1936 it was $4,184,-560.81 and it spent $813,283.42 for plant and equipment and $384,655.20 to purchase shares of its own free stock. In that year it paid dividends of $4.50 on its free stock and of $1.375 on its restricted stock, making the above total of $2,210,894.88 or 52.-83% of its net income. As of December 31, 1936, it had a book surplus of $4,913,-737.07 and a capital account of $6,000,000, including $1,000,000 transferred from surplus. In 1937 its net income was $3,792,-244.62 and it spent $1,623,332.42 for plant and equipment and $856,603.28 to purchase shares of its own free stock. In that year it paid dividends of $3.875 on its free stock and of $1.375 on its restricted stock, making the above total of $1,960,768.77 or 51.70% of its net income. As of December 31, 1937, it had a book surplus of $5,745,-212.92 and a capital account of $7,000,000 for diversification of its products, including $1,000,000 transferred from surplus.

The above figures were stipulated as correct. It was also stipulated that the balance of undistributed net income in 1936 was $2,201,028.88 and in 1937 was $1,831,475.85.

John F. McCabe, accountant and auditor with the Internal Revenue Bureau, testified as follows:

"Q. Now * * * what were the accumulated earnings and profits of (plaintiff) at the close of 1936, and * * * how did you arrive at that figure? A.

The total is $10,913,737.07 * * *. That was made up of surplus as shown by the books of $4,913,737.07, and the transfer back of $6,000,000 which had been transferred from surplus to capital account—$5,000,000 in 1935, and $1,000,000 in 1936.

"Q. Now * * * what were the accumulated earnings and profits of (plaintiff) at the end of 1937? A. $12,745,212.92.

"Q. And how did you arrive at that figure? A. By taking the figure that is shown by the books, Exhibit P–2—$5,745,-212.92, and adding back $7,000,000 which had been transferred from surplus to capital in 1935, 1936, and 1937."

Plaintiff's investment in United States, state and municipal bonds and stocks and other investments in 1936 aggregated $9,-036,743.27; in 1937, $10,192,815.47; in 1941, $18,949,883.88.

Were plaintiff's undistributed earnings or profits of $2,201,028.88 in 1936 and of $1,831,475.85 in 1937 permitted to accumulate beyond the reasonable needs of plaintiff's business? Defendant contends that they were.

Plaintiff, in its claim for refund of $740,918.23 plus interest, income tax of 1936, and in its claim for refund of $801,-710.29 plus interest, income tax for 1937, alleges that the dividend practice followed in those years "was motivated by (a) the purpose and intention of providing adequately for the present and prospective needs of the taxpayer's business; (b) the purpose of so building up the earnings and assets of the taxpayer as to secure the release of shares of stock from an onerous waiver of dividends agreed to in 1927 by all the then stockholders in connection with the sale of part of their holdings in that year and (c) the purpose of minimizing the impact on the taxpayer of a tax imposed on undistributed profits for the calendar year 1936 (respectively 1937)."

█ Reason designated (b) must be rejected because of the prior decision in Trico Products Corp. v. Commissioner, 46 B.T.A. 346, affirmed 2 Cir., 137 F.2d 424, certiorari denied 320 U.S. 799, 64 S.Ct. 369, 88 L.Ed. 482.

Reason (b) was urged before the Board of Tax Appeals when plaintiff claimed a refund of surplus taxes paid for the calendar years 1934 and 1935. The Board rejected it and said:

"Petitioner urges as its principal contention that it was a reasonable need of the business to build up an invested capital which, by increasing total earnings, would enable the controlling stockholders to release a larger amount of stock from the restriction originally placed upon it. This may have been a natural course for the majority of the stockholders to cause the corporation to adopt for their own private ends, but it had nothing to do with the needs of the business, and in fact to the extent that it benefited the controlling stockholders there was a corresponding detriment to the remainder. Congress can not have intended that the term 'reasonable needs of the business' should be satisfied by the financial interests of a limited stockholding group." 46 B.T.A. at page 378.

Plaintiff's three reasons alleged in its claims for refund are expanded into eight reasons in its counsel's brief. They are:

(1) The basic patents on plaintiff's principal product, the vacuum operated windshield wiper, were of limited life, expiring in 1942, and it was necessary to accumulate funds for the development and marketing of new products.

(2) These basic patents were plaintiff's principal asset, were carried on its books at a nominal value of $1, and it had to conserve part of its income so that it would have a tangible value to continue to do business with after the expiration of the patents in 1942.

Regarding these first two reasons, the following excerpts from the opinion in Trico Products Corp. v. Commissioner, 46 B.T.A. 346, are pertinent:

"It is urged that upon the termination of the basic patent, petitioner's business would be adversely affected unless it were prepared to maintain its position either in a competitive market or by means of new products or in some other way. But we can not believe that there is no limit to the sum, no matter how great, which would be a proper accumulation under those circumstances and for those purposes. It

may be that the amount of accumulations appropriate to the situation would be a matter of opinion. But the question is the reasonable needs of petitioner's business; and the determination of what is reasonable under a given set of circumstances is typically a judicial question." 46 B.T.A. at page 375.

What the Board then said about plaintiff's undistributed profits accumulated in 1934 and 1935 is equally pertinent to the calendar years 1936 and 1937. It said:

"We know that at the beginning of 1934, the first taxable year before us, petitioner's capital and surplus was nearly $7,000,000; that at the end of 1935 it was over $10,000,-000; that the general trend of its earnings had been upward since its organization; that its business was stable and assured; and that on the basis of past experience petitioner could look forward to surplus earnings running into the millions annually. The initial cost to petitioner of all its patents was trifling; and while the basic patent would expire in 1942, petitioner had constantly improved and protected the development of its products by improvement patents. * * * And, of course, there would still remain the petitioner's existing plant, either for conversion to the new use or for continued operation on the old product. We could not find from these facts that there were no accumulations beyond the reasonable needs of petitioner's business." 46 B.T.A. at page 376.

According to the figures given in plaintiff's brief (p. 60), plaintiff's "Capital stock and surplus per balance sheet at beginning of year (Treasury stock included)" was as follows: 1936—$10,512,708.-19; 1937—$12,663,737.07; 1938—$14,495,-212.92; 1939—$15,768,763.59; 1940—$18,-266,605.36; 1941—$22,034,364.72; 1942—$24,782,160.99. There is no evidence that the payment of the deficiency taxes of $403,714.21 for 1934; $1,214,217.68 for 1935; $740,918.28 for 1936, and $801,710.-29 for 1937 has crippled or will cripple plaintiff's business.

(3) Plaintiff argues that its earnings depended on its position as sole supplier of windshield wipers to the automotive industry and that, to maintain this position, it had to conserve part of its earnings to satisfy car builders that its wiper would always be available in the quantity and quality required.

In reply it can be said that plaintiff acquired sole supplier position because it made the best wipers at the lowest prices and not because it maintained large surpluses. If it could not have continued to make better and cheaper wipers than its competitors, they would have won regardless of the amount of plaintiff's undistributed profits.

(4) Plaintiff argues that its accumulations were necessary to release the restricted stock under the recapitalization agreements of 1927. This is only an elaboration of reason (b) alleged in plaintiff's Claims for Refund of the 1934 and 1935 deficiency taxes. In its brief (p. 10), plaintiff alleges that, under those agreements, it "issued 675,000 shares of stock, of which 450,000, all held by the management, consisted of deferred shares on which dividends up to $2.50 per annum were waived, and under which Trico could make no change in its capitalization or have access to outside sources of capital until all the deferred shares were released from the dividend waiver; and that Trico conserved its earnings in order to bring about the release of this deferred stock so that the holders thereof might receive the $2.50 dividends thereon, and the Company be freed from the provisions of that contract restricting its source of capital. * * * Of course the Trico directors who were holders of the deferred stock also had a personal interest in the release of the deferred stock."

This reason has already been considered and rejected in a prior part of this opinion.

(5) Plaintiff argues that, to obtain orders for its patented windshield wiper, it had to agree to defend every suit for patent infringement brought against car manufacturers, to pay damages resulting therefrom and "had to build up a substantial backlog of liquid assets" for this purpose.

The answer to this is that plaintiff's basic patent was judicially sustained in

318

1927. Trico Products Corp. v. Perfection Products Co., D.C., 19 F.2d 173, affirmed 6 Cir., 31 F.2d 522. Its patent position became impregnable. Pres. Oishei testified as follows: "We knew no other situation in the industry that could be parallel to Trico's position. In fact, it was commonly known among other suppliers of parts that the patent situation as it had developed in Trico represented a patent wall that had no parallel."

(6) Plaintiff argues that its free stock sold to the public in 1927 had behind it tangible assets of about $3 a share and it was thought that the public would be swindled unless plaintiff built up its tangible resources to give its stock a net worth of at least $31 a share.

This argument was advanced before the Board of Tax Appeals in plaintiff's suit for refund of the 1934 and 1935 deficiency taxes and was rejected. The Board said:

"The evidence purporting to sustain an intention to increase petitioner's assets so that the book value of the stock would equal the figure at which it was sold to the public is less than persuasive. * * * Not only was there no enforceable contract to devote the corporation's earnings to the creation of asset value, but if there were even a nebulous plan of that kind it was not so inflexible but that as soon as there came to be a pecuniary advantage in the distribution of larger dividends as the result of the undistributed surplus tax in 1936 and 1937, the corporation had no difficulty in departing from the program and practically doubling its dividend declarations." 46 B.T.A. at pages 374, 375.

(7) Plaintiff argues that its business was that of exploiting patents and consequently it had to have on hand funds to protect its patents, to prosecute suits for infringement and discourage attempts to infringe.

This appears to be a variant of reason (5). Plaintiff's patent position became firmly established in 1927 and expenses for protecting patents thereafter could have been paid out of current earnings.

(8) Plaintiff argues that the Federal Undistributed Profits Tax was in effect in 1936 and 1937 and to the extent that plaintiff adhered to its policy of conservation of earnings it would be subjected to a high rate of tax; that payment of a larger dividend than customary in those years was for a business purpose—to minimize its liability for said tax—and had the direct effect. of increasing the surtaxes payable by its stockholders.

Defendant, in its brief, calls this reason "extremely vague" and justly argues that it really means that plaintiff in 1936 and 1937 declared dividends of more than $2.50 because it preferred to give the surplus to its stockholders rather than to the Government. It does not prove that the undistributed balance of surplus was needed in plaintiff's business.

The statute does not define the term "the reasonable needs of the business." In Treasury Regulations 94, promulgated under the Revenue Act of 1936, it is said:

"Art. 102–3. Unreasonable accumulation of profits.—An accumulation of earnings or profits (including the undistributed earnings or profits of prior years) is unreasonable if it is not required for the purposes of the business, considering all the circumstances of the case. * * * No attempt is here made to enumerate all the ways in which earnings or profits of a corporation may be accumulated for the reasonable needs of the business. Undistributed income is properly accumulated if retained for working capital needed by the business; or if invested in additions to plant reasonably required by the business; or if in accordance with contract obligations placed to the credit of a sinking fund for the purpose of retiring bonds issued by the corporation. The nature of the investment of earnings or profits is immaterial if they are not in fact needed in the business. Among other things, the nature of the business, the financial condition of the corporation at the close of the taxable year, and the use of the undistributed earnings will be considered in determining the reasonableness of the accumulations.

"The business of a corporation is not merely that which it has previously carried on, but includes in general any line of business which it may undertake. How-

ever, a radical change of business when a considerable surplus has been accumulated may afford evidence of a purpose to avoid the surtax."

"The first statute which provided for taxation where corporate profits are accumulated for the purpose of preventing the imposition of surtaxes upon stockholders was the Tariff Act of 1913. * * * In that Act, in the Revenue Act of 1916 * * * and in the Revenue Act of 1918, * * * the tax was laid upon the shareholder. In all later Revenue Acts, the tax is laid upon the corporation." Helvering v. Nat. Grocery Co., 304 U.S. 282, at page 288, 58 S.Ct. 932, at page 935, 82 L.Ed. 1346, Note 4.

In that case the court said: "If it preferred, Congress could lay the tax upon the corporation, as was done by section 104 (Revenue Act of 1928 [26 U.S.C.A. Int.Rev.Acts, page 375]). The penal nature of the imposition does not prevent its being valid, as the tax was otherwise permissible under the Constitution." 304 U.S. at pages 288, 289, 58 S.Ct. at page 93, 82 L.Ed. 1346.

The purpose of this statute has been thus stated:

"As the theory of the revenue acts has been to tax corporate profits to the corporation, and their receipt only when distributed to the stockholders, the purpose of the legislation is to compel the company to distribute any profits not needed for the conduct of its business so that, when so distributed, individual stockholders will become liable not only for normal but for surtax on the dividends received." Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 699, 63 S.Ct. 843, 846, 87 L.Ed. 1086.

It has been held that "this statute, imposing a tax which is in effect a penalty, should be strictly construed and should not be extended to cover cases which do not fall within its letter." Charleston Lumber Co. v. United States, D.C., 20 F.Supp. 83, 87.

The "reasonable needs of the business" must be determined by the court. In Trico Products Corp. v. Commissioner, 46 B.T.A. 346, it is said:

"But the question is the reasonable needs of petitioner's business; and the determination of what is reasonable under a given set of circumstances is typically a judicial question. See United Business Corporation of America v. Commissioner, 2 Cir., 62 F.2d 754, certiorari denied 290 U.S. 635 [54 S.Ct. 53, 78 L.Ed. 552]; L. Schepp Co. [v. Commissioner of Internal Revenue], 25 B. T. A. 419, 429; United States v. Ragen, 314 U.S. 513 [62 S.Ct. 374, 86 L.Ed. 383]. 'What would be reasonable in one situation or for one business might be clearly unreasonable in another.' William C. De Mille Productions, Inc. [v. Commissioner of Internal Revenue], 30 B. T. A. 826, 830." 46 B. T. A. at page 375.

John R. Oishei and Paul A. Schoelkopf were the only directors of plaintiff who testified about its dividend policy. Plaintiff's brief states: "Mr. Oishei and Mr. Schoelkopf are men of highest standing in the community. The records of these men are spotless and their achievements are such as to command respect. Mr. Schoelkopf is wholly disinterested." It is therefore urged that their testimony "should weigh heavily with the Court."

Whether the two Trico directors were interested or disinterested or men of high character does not determine the question at issue. Disinterested directors may be more conservative than the statute permits. Interested directors may testify to corporate needs which do not exist. "While the judgment of the corporate directors is not to be disregarded, there is no rule that it is conclusive." L. Schepp v. Commissioner, 25 B. T. A. 419, 429.

Pres. Oishei was a large stockholder and Mr. Schoelkopf's fiscal philosophy was revealed in his testimony when he said:

"Q. Now, you testified about the building up of a surplus of the company for future years; did you have in your mind any particular limit or ceiling on which that surplus would go? A. The sky was the limit, to me."

It appears that Pres. Oishei was the dominant factor in determining plaintiff's financial policy. He has adhered to a policy of conservation of earnings. This policy is discussed at great length in plaintiff's

brief. In the conclusion of the brief it is said: "This is the American system of expansion—out of earnings—which has proved so basically superior over the many years of business history." p. 83. On the next page mention is made of "The operation of this traditional American method in Trico's case."

It might be argued that plaintiff's surpluses at the end of the calendar years 1936 and 1937 were not needed in its business for if this money had been needed it would have been spent. Does the statute require this interpretation or does it allow some provision for future needs?

Plaintiff quotes with approval the language of United States Business Corporation of America v. Commissioner, 33 B. T. A. 83, 87, to wit: "The application of section 220 (now section 102), in any particular taxable year is wholly dependent upon whether the facts and circumstances pertaining to that year bring the taxpayer within the scope of that section." The Board in that case, however, was dealing with the matter of res judicata.

In McCutchin Drilling Co. v. Commissioner, 5 Cir., 143 F.2d 480, 482, the court said:

"Petitioner argues that it was entitled to adequate working capital both to finance its current operations and to provide for anticipated expansion. * * * The statute, we think, contemplates immediate need, need associated with business in hand, apparently absent under the facts of this case." Vide Wilson Bros. & Co. v. Commissioner, 9 Cir., 124 F.2d 606, 609.

■ Accumulations have been allowed for definite future needs. General Smelting Co. v. Commissioner, 4 T. C. 313. There must be "substantial proof of a specific plan, objective or contingency which, in the exercise of good business judgment, demanded the accumulation of the earnings and profits in a reasonable and reasonably definite amount." Semagraph Co. v. Commissioner, 1944 P-H T. C. Mem.Dec., par. 44, 264, affirmed 4 Cir., 152 F.2d 62. Vide Becton, Dickinson & Co. v. Commissioner, 1942 P-H B. T. A. Mem.Dec., par. 42, 441; W. H. Gunlocke Chair Co. v. Commissioner, 1943 P-H T. C. Mem.Dec., par. 43, 443,

affirmed 2 Cir., 145 F.2d 791; Whitney Chain & Mfg. Co. v. Commissioner, 3 T. C. 1109, 1119, affirmed 2 Cir., 149 F.2d 936.

Plaintiff, in its brief, asserts: "Trico is here fighting for its very existence. If it is subjected to all these Section 102 taxes, and is required in the minority stockholders' suits based on the assessment of these taxes to distribute all its resources, it will be completely crippled. It can at very best hope to be a company producing a fraction of the windshield wipers required by the automotive industry. On the other hand, if it can retain the funds necessary to finance the Lift-O-Matic its future prospects are good. Assuming that no more than one-fourth of the new car production is equipped with the Lift-O-Matic, it is anticipated that gross sales of this product will be about $27,000,000 a year. The peak of Trico's gross sales to date is the $15,-287,625.72 of gross sales for the year 1941."

This Lift-O-Matic is a device "for raising and lowering car windows by the touch of a button."

"Trico does not contend that it would no longer do any windshield wiper business after 1942. But the fact is it will no longer be the sole supplier of windshield wipers. It will lose a substantial part of that business. * * * While it is true that Trico has some improvement patents which extended beyond 1942, these are relatively unimportant."

After describing six Trico products, viz., Claireon horn, throttle guard, Venturi muffler, fan, windshield washer and vacuum pump, plaintiff's brief continues: "The above devices represent a part of Trico's efforts to diversify its products in order to retain its business in anticipation of the expiration of the basic windshield wiper patents. It has always maintained a research and experimental department, and it owns more than 800 patents falling into about a hundred separate classifications. However, it was not felt that a solution to the Company's problem of diversification of products was in sight until the Lift-O-Matic device was developed for raising and lowering car windows by vacuum."

The brief then states: "The development of the Lift-O-Matic had its origin in 1926

when Trico perfected the 'Visionall' type of windshield wiper. * * * It became apparent that the Visionall cylinder might be used to raise and lower windows. However, Trico did not immediately go into this idea. In 1934 Trico decided to go ahead * * * by 1938 Trico was able to bring out a working model. The device was first introduced to the public when it appeared on an exhibit-model Cadillac at an automobile show in 1940. * * * The Lift-O-Matic in 1940 consisted only of the power unit of the window raising device." The new Lift-O-Matic, which was exhibited to the court, "includes every part of the apparatus for the raising and lowering of car windows. Trico feels that now is the time to go ahead with the Lift-O-Matic."

There is no specific mention of the Lift-O-Matic in plaintiff's Claims for Refund of the 1936 and 1937 deficiency taxes. In both claims is the following allegation:

"The taxpayer was also confronted with the fact that in 1942 the basic patents on the automatic windshield wiper, which was its major source of income, would begin to expire. It was impossible to foresee what competitive conditions would be after the expiration of the patents. The taxpayer, therefore, maintained a large experimental department to develop new products and conducted extensive research and experiments for this purpose. * * * The experimental policy bore fruit in the form of an automatic vacuum device for raising and lowering automobile windows which, after a period of development, was introduced to the automobile trade in 1940 and enthusiastically received by it. The adoption of this device on 1,000,000 cars a year would require plant extension by the taxpayer which would cost from $3,000-000 to $5,000,000 and which would double the taxpayer's production."

Plaintiff says: "These initial cash outlays, aggregating about $16,000,000, are capital investments necessary to assure that Trico may go ahead, instead of backwards, now that its basic patents on vacuum-operated windshield wipers have expired. This amount of venture capital must be invested before one cent of profit can be realized from the Lift-O-Matic."

It does not appear, however, that preparation for the manufacture of Lift-O-Matic played any important part in the accumulations during the years 1936 and 1937.

Plaintiff also states: "In 1934 Trico decided to go ahead. * * * However, just at this time, the Fisher Body Division of General Motors began to push its new feature of 'no-draft ventilation' which was adopted by all car manufacturers. The Lift-O-Matic, as Mr. Oishei testified, 'was sort of put on ice' inasmuch as the idea behind no-draft ventilation was that it was unnecessary to raise or lower the car windows. * * * Although it is necessary to open the car windows for many purposes, Trico could obviously not promote its Lift-O-Matic in the face of the great publicity which the car manufacturers themselves were giving to no-draft ventilation and the idea that it was not necessary to open car windows. During the period of the featuring of no-draft ventilation, Trico's chief experimental engineer, who was the inventor of the Visionall device, suffered serious illness which further delayed development of the Lift-O-Matic, but by 1938 Trico was able to bring out a working model, * * * first introduced to the public * * * on an exhibit-model Cadillac at an automobile show in 1940. * * * Trico produced only the power unit, Ackerman produced the actual window lifting mechanism. * * * Trico had only a limited opportunity to further develop the Lift-O-Matic during the war. * * * Trico now has a complete Lift-O-Matic system ready for production."

Plaintiff stipulated that its costs for experimental work in 1936 was $40,430.51 and in 1937 was $45,467.31. It does not appear how much, if any, of this money was expended on developing the Lift-O-Matic. The complete Lift-O-Matic, on the exploitation of which plaintiff now bases its hopes of great profits, was apparently unknown to it during the calendar years 1936 and 1937.

This case exhibits the old conflict between public and private finance. The Government always needs money and in recent years has needed very much money. To meet this need in part, Congress enacted

the Revenue Act of 1936, 26 U.S.C.A. Int. Rev.Acts, page 819 et seq. Plaintiff, on the other hand, has consistently pursued a policy of conservation of earnings. If this policy has conflicted with the Act, the latter must prevail.

In the 1927 prospectus of Hornblower & Weeks offering the 175,000 shares of common stock to the public at $31 a share, it is said: "Balance sheet as of June 30th (1927), adjusted to the present capitalization, as certified to by Messrs. Price, Waterhouse & Co., showed current assets of $1,-464,614 compared with current liabilities of $464,614, leaving a working capital of $1,-000,000, which is deemed to be ample for the present needs of the Company."

The bankers syndicate agreement of September 1, 1927, provided "that the fixed assets of the Corporation shall amount to not less than * * * ($1,100,000) and that the net current assets shall be not less than * * * ($1,000,000) * * * and that there shall be no other change in the condition of the corporation from the condition shown on the balance sheet of April 30, 1927, except changes arising in the ordinary course of business and except that the preferred stock shall be retired, that a cash dividend of $110,000 shall have been paid in July, 1927, * * * and that all patents owned by John R. Oishei shall have been assigned to the Corporation and a salary and profit sharing agreement with him, approved by the Bankers, shall have been substituted for his existing royalty agreement." There was no provision requiring plaintiff to increase its assets so as to build up the book value of the 175,000 shares of free stock to be sold to the public to $31 a share.

Pursuant to agreement, plaintiff paid to Mr. Oishei for use of his patents $787,726.-96 in 1936 and $739,790.37 in 1937. Plaintiff's total capital stock and surplus at the end of 1936 was $12,663,737.07, of 1937 was $14,495,212.92. This steadily increased to $24,782,160.99 at the end of 1941. The book value of its stock became greater than $31 a share in 1940.

If reserves were needed in 1936 and 1937 to exploit the Lift-O-Matic, they constituted only a small part of plaintiff's needs. The language of the opinion in Semagraph Co. v. Commissioner, 4 Cir., 152 F.2d 62, 65, is pertinent:

"In short, there was ground for the inference of the Tax Court that in 1939 and 1940 the assets of the Semagraph Company were not being held for the sole purpose of developing the Semagraph enterprise but for other purposes of the sole owner. In addition, it should be pointed out that in 1938, the year before, and in 1941 and 1942, the years after the tax years in question, dividends were paid by the Semagraph Company although the need for funds for the promotion and development of the invention was constant throughout the whole period."

In the instant case plaintiff actually paid extra dividends in 1936 and 1937.

It therefore appears that plaintiff's undistributed earnings or profits for the calendar years 1936 and 1937, taxed by the Commissioner of Internal Revenue, had been permitted to accumulate beyond the reasonable needs of its business.

This brings us to the second question— was this accumulation intentionally permitted with a purpose to avoid surtax upon plaintiff's shareholders?

Discussing Sec. 220 of the Revenue Act of 1921, now Sec. 102 of the Revenue Act of 1936, the court in R. C. Tway Coal Sales Co. v. United States, D.C., 3 F.Supp. 668, affirmed 6 Cir., 75 F.2d 336, said:

"A careful study of section 220 discloses that before there can be an assessment under its provisions, in a case such as the one presented here, there must be not only an accumulation of grains and profits beyond the reasonable business needs of the corporation, but such accumulation must have been permitted by the corporation with the intention and for the purpose of enabling its stockholders to evade the payment of surtaxes on dividends which otherwise would have been distributed to them. Even if it should clearly appear that the accumulations were in excess of the reasonable needs of the corporate business, section 220 would not apply unless it further appears that the accumulations were inten-

tionally permitted for the express purpose of enabling the stockholders to evade the surtax." 3 F.Supp. at page 671.

During the critical and competitive years before plaintiff's position became firmly established in 1927, a policy of strict conservation of assets, discussed in plaintiff's brief, may have been necessary. It was apparently not necessary during the calendar years 1936 and 1937.

"A corporate practice adopted for mere convenience or other reasons, and without tax significance when adopted, may have been continued with the additional motive of avoiding surtax on the stockholders. The Board's conclusion may justifiably have been reached in the view that, whatever the motive when the practice of accumulation was adopted, the purpose of avoiding surtax induced, or aided in inducing, the continuance of the practice." Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 699, 63 S.Ct. 843, 846, 87 L.Ed. 1086.

Although there must have been an intent to avoid the surtax, this need not have been the sole or dominant intent in permitting the accumulations. The Circuit Court of Appeals, Second Circuit, has said: "Nor can we subscribe to the view that the prevention of the imposition of surtaxes must have been shown to have been the dominant factor behind the accumulations." Trico Products Corp. v. Commissioner, 2 Cir., 137 F.2d 424, 426, certiorari denied 320 U.S. 799, 64 S.Ct. 369, 88 L.Ed. 482.

Defendant admits that plaintiff is not "a mere holding or investment company." This leaves the second category of prima facie evidence declared by the statute in Sec. 102(b): "The fact * * * that the earnings or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to avoid surtax upon shareholders."

"It is well settled that the determination of the Commissioner of Internal Revenue is presumed to be correct and the burden is upon the taxpayer to prove it otherwise." Charleston Lumber Co. v. United States, D.C., 20 F.Supp. 83, 87.

In Trico Products Corp. v. Commissioner, 46 B.T.A. 346, 374, supra, the Board said:

"So that if the reasonable needs of the business are to be relied upon as a means of convincing us of the complete innocence of petitioner's purpose, this must at least require a demonstration that there was a purpose to provide for those business needs so satisfying and persuasive that it is unnecessary to look further for a motive for the action under criticism. And to this it must be added that a demonstrated purpose may be 'not inconsistent with another purpose to reduce income taxes by having a corporation accumulate its gains and profits rather than distribute them.' Nipoch Corporation [v. Commissioner of Internal Revenue], 36 B.T.A. 662, 668. And 'It is to this complete lack of the condemned purpose that its evidence must be directed and if it does not fairly prove an absence of such purpose it must fail regardless of what other purposes it may prove.' R. L. Blaffer & Co. [v. Commissioner of Internal Revenue], 37 B.T.A. 851, 856, affirmed [5 Cir.], 103 F.2d 487, certiorari denied 308 U.S. 576 [60 S.Ct. 91, 84 L.Ed. 483]."

"A statute which stands on the footing of the participants' state of mind may need the support of presumption, indeed be practically unenforceable without it, but the test remains the state of mind itself, and the presumption does no more than make the taxpayer show his hand." United Business Corp. v. Commissioner, 2 Cir., 62 F.2d 754, 755, certiorari denied 290 U.S. 635, 54 S. Ct. 53, 78 L.Ed. 552.

The Revenue Act of 1938, applicable to the taxable years beginning after December 31, 1938, provided: "The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary." Tit. 26, U.S. C.A. Int.Rev.Code, § 102(c). The Revenue Act of 1936, however, made such accumulation only "prima facie evidence of a purpose to avoid surtax upon shareholders."

This did not require the court to accept as true a corporation's denial of any intent to avoid the surtax. Helvering v. Nat. Grocery Co , 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346; Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 701, 63 S.Ct. 843, 87 L.Ed. 1086.

Plaintiff, after discussing its conservation policy after 1927, states: "We contend and stand on the simple proposition that a corporation such as Trico, which intends to maintain itself as a going concern, must preserve and maintain its capital. This is so elementary as to be obvious since capital is a necessary source of income in industrial enterprise."

This is true as a general proposition in economics. The evidence, however, discloses that plaintiff during the calendar years 1936 and 1937 accumulated earnings or profits beyond the reasonable needs of its business.

From the beginning of plaintiff's corporate existence it has been controlled by John R. Oishei and Dr. Peter Cornell through their ownership of more than 50% of the stock of Trico Securities Corporation. If plaintiff in 1936 had distributed all of its net earnings and had the share so received by Trico Securities Corporation been distributed by it, Mr. Oishei would have had to pay an additional income tax of $358,832.52 and Dr. Cornell of $326,871.45. They and the four other largest stockholders—all six being men of means whose income was in the high tax brackets—would have had to pay a total tax of $962,944.80. If such a distribution had been made in 1937, Mr. Oishei would have had to pay $328,061.64, Dr. Cornell $305,796.26 and all the six largest shareholders $890,833,23. The same situation was presented in Trico Products Corp. v. Commissioner, 46 B.T.A. 346, supra, and the Board said: "They apparently had no financial need for the dividends. It seems to us that a naive and credulous tribunal would be required for the assumption that in the confirmed practice of methodical accumulation there was no taint of a purpose to procure so desirable a monetary result for the individuals responsible for the petitioner's decisions." 46 B.T.A. at page 380.

While the last cited decision is not res judicata for the years 1936 and 1937 (United Business Corp. of America v. Commissioner, 33 B.T.A. 83, 87, 88), the essential financial facts of plaintiff's history during those years are so similar to the facts of 1934 and 1935 as to justify a judgment for defendant. Plaintiff, however, contends that there is an essential difference. It asserts: "Trico was advised by its counsel that proof of a motive to conserve earnings to release the deferred stock would in itself be a complete defense and that it would not be necessary to go into the intimate details of the Company's business secrets. * * * Because of Trico's determination not to make what it and its counsel thought to be an unnecessary disclosure of its trade secrets and relationships with principal customers, the record as concerns the needs of Trico's business was woefully inadequate."

Pres. Oishei testified: "Our principal reason for not bringing out the details of our business in 1940 was the fear of injury to the business. We simply could not make up our minds that we would be justified— Because I was afraid of injury to the business. That was the real reason. * * * I had a belief that the absence of the motive was sufficient to defend ourselves in that case and we relied on it. * * * I had advice of counsel. We believed we were going to make a full defense without going into the details of the business. * * * The other principal reason was that we had the patents, we had contracts. They were not ordinary contracts and we felt that our customers were entitled to protection." There was a failure to show, however, how a disclosure of these matters in 1940 would have jeopardized plaintiff's business.

Evidence of plaintiff's financial affairs not only during 1934–1935 but also during 1936–1937 was given in the prior action and is reported at length in the Findings of Fact in 46 B.T.A. at pages 348–365. The Board concluded: "The business of the corporation was as free from hazard, as firmly established, and as favorable in prospect as could well be imagined. Production costs were constant, sales certain,

collection losses negligible. If at the beginning of the tax years in issue petitioner's officers had looked back over its history since the recapitalization in 1927, they would have seen a constantly mounting record of earnings, with the exception of the three depression years 1930 through 1932. * * * And, as bearing upon purpose, we may look to the history following this period which discloses ultimate accumulations of seventeen millions of dollars in an interval of a dozen years; or, in matter of ratio, approximately ten times the stated capital with which the corporation began operations so short a time before." 46 B.T.A. at pages 380, 381. Plaintiff's total capital stock and surplus rose steadily from $10,512,708.19 in 1935 to $24,782,160.99 in 1941.

Plaintiff apparently contends these conclusions were "contrary to fact" because in 1940 the Board did not know that the surpluses were really needed for undisclosed purposes. These purposes have now been revealed and have been discussed in a prior part of this opinion. They do not establish that the taxed surpluses for the calendar years 1936 and 1937 were reasonably needed in plaintiff's business.

The Revenue Act of 1936 made the accumulation of earnings or profits beyond the reasonable needs of the business only prima facie evidence of a purpose to avoid surtax upon shareholders.

"Ordinarily it will indeed be difficult to prove the forbidden purpose, unless the accumulations are too large for the fair needs of the business. But it may not be impossible to do so, even though the profits arise out of normal business. * * * The argument is that the standard set is too vague for execution; that it is impossible definitely to say when the purpose of those who use the corporation to accumulate its profits is to exonerate its shareholders. Purpose is indeed not often a factor in legal transactions, though at times it is; but intent is often material, and whatever the difficulties of proof, the issue is concrete enough. Nothing is more frequent in human relations than the effort to learn what goes on in others' minds. * * * Moreover, since the result of the presumption is at most no more than to compel the taxpayer to disclose the facts, and since the tax itself is definitely enough determined, the whole issue is irrelevant." United Business Corp. of America v. Commissioner, 2 Cir., 62 F. 2d 754, 755, 756.

The fact that the taxed surplus for the calendar years 1936 and 1937 was accumulated beyond the reasonable needs of plaintiff's business and the further fact that plaintiff's six largest stockholders, who were wealthy men, saved a large federal income tax that would have been imposed upon them had the taxed surplus been distributed, is evidence enough to uphold the taxes in question. Trico Products Corp. v. Commissioner, 46 B.T.A. 346, 2 Cir., 137 F.2d 424, certiorari denied 320 U.S. 799, 64 S.Ct. 369, 88 L.Ed. 482.

Plaintiff's brief concludes with an argumentum ad hominem, to wit: "Trico has been a good thing for the Government, and if not put out of business by Section 102 taxes and the stockholders' suit instigated thereby, the prospects are even better. * * * In short, the Revenue Department is engaged in a short-sighted attempt to kill the goose that lays the golden eggs. The Government is involved in a cause which, were it to succeed, would lose for the Government many times over the amount of the penalties which it seeks to enforce."

It is not for this court to judge the wisdom of the fiscal policy of Congress. "It is the duty of the Congress to determine what means are appropriate to carry out the purpose of the revenue acts." Almours Securities v. Commissioner, 5 Cir., 91 F.2d 427, 429.

There is no proof that the retention of the 1936 and 1937 taxes paid by plaintiff to the Government has or will impede its progress or deprive it of "the opportunity to fulfill its destiny," which plaintiff asks. The matters involved in this law suit are a decade old. Since then plaintiff has prospered. It has paid its taxes to the Government and will not have to pay them again. It may have had good reasons to pursue a conservative policy during its years of struggle and may now think that such a policy is necessary to exploit its Lift-O-

Matic, but when this policy conflicts with the fiscal policy of Congress, the latter must prevail.

Let judgment be entered in favor of the defendant and against the plaintiff, with costs. Let the defendant submit for signature findings to accord herewith.